Luigi R. Marano, J.
After trial in this filiation proceeding in which the respondent had denied paternity, I adjudged the *712 respondent to be the father of the infant child born in January, 1967. I thereupon made an order directing the respondent to pay the sum of $15 weekly to the petitioner, together with the hospitalization coverage.
It appears that the respondent is now married to a third party other than the petitioner. The petitioner resides with her mother and several brothers and sisters in her mother’s home. It appears further that the petitioner’s family and friends (other than her mother) are under the impression that the petitioner hurriedly married a soldier who immediately was shipped to Viet Nam where he was killed.
I now have before me an application by the respondent for visitation rights, which the petitioner is vigorously opposing.
This, being a filiation proceeding, is a civil action designed to protect the welfare of the child and, therefore, statutes covering such proceedings should be liberally construed. (Schaschlo v. Taishoff, 2 N Y 2d 408; Matter of Gordon v. Coe, 54 Misc 2d 967.)
We need not look to any statute for authority to entertain an application for visitation rights since this rests squarely on the broad power of equity to make such determination as is dictated by the consideration of the welfare of the child. Generally, the power rests with the Family Court to make any order in matters within its jurisdiction, including permission for visitation. (Matter of Anonymous v. Anonymous, 50 Misc 2d 43.)
Our courts have come a long way from the common law which held that an illegitimate child was filius nullius, the child of no one, the community, not its natural parent, being responsible for its support. (Duerr v. Wittmann, 5 A D 2d 326.)
The matter of visitation is a species of custody and involves correlative control over and, therefore, interference to some extent in the upbringing of the child. (People ex rel. Meredith v. Meredith, 272 App. Div. 79, 87, affd. 297 N. Y. 692.)
Paraphrasing the language of Judge Cabdozo in Finlay v. Finlay (240 N. Y. 429, 433-434) the court acts as parens patriae to do what is best for the infant and the best interest of the infant is the guiding principle in the determination of custody and rights of visitation.
As a matter of fact, in the Meredith case, the court stated that although the mother of an illegitimate child is prima facie entitled to its custody when she is a proper and suitable person, that the court would exercise its function in a case where the mother was unfit to award custody to the father and a fortiori visitation rights. The Appellate Division stated the same consideration for the welfare of the child obtains in England. (See Queen v. Barnado, [1891] 1 Q. B. 194, 200.)
*713 The courts, in matters of this kind, have often declared that the Trial Judge is in the best position to evaluate the character of petitioner and respondent and the printed record is not a satisfactory substitute for the first hand observation by the Judge of the parties and witnesses.
In the case of Matter of Endresen (277 App. Div. 894) the court reiterated that the paramount consideration in any determination concerning visitation rights is the welfare of the child and in People ex rel. Heller v. Heller (184 Misc. 709) it was decided that the court may deny visitation where there is a possibility, however slight, that harm may come to the child if it is granted.
In the 1958 case of Matter of Anonymous (12 Misc 2d 211), it was decided that in a case where the parties and their two children had been living together as a family unit, he would grant visitation rights although he made clear that were this a situation where the children had merely been begotten through a temporary illicit relationship, his decision would be different.
In 1961, the matter of visitation rights of the putative father was before the Appellate Division of the First Department in the case of People ex rel. “ Francois ” v. “ Ivanova ” (14 A D 2d 317) and in a Per Curiam decision (with Justice Breitel. dissenting), the court reiterating that the Trial Judge was in a unique position to form an estimate of the quality of the parties, sustained the lower court’s habeas corpus proceeding granting visitation rights to the putative father where the parties and the infant lived together as a family unit for upwards of six years prior to the commencement of the proceeding.
It must be noted, however, that in the Ivanova case, Justice Breitel in his dissenting opinion, did set forth what would appear on first blush to be substantially cogent reasons for totally denying visitation rights to a putative father.
My research would indicate the last written opinion in New York on the subject is the well-reasoned case decided by Judge Hugh R. Elwyn. In the Matter of Cornell v. Hartley (54 Misc 2d 732), where the natural mother and the putative father had been living together on and off at various times, that the father might have some visitation rights, only with the mother’s consent.
In the case of Matter of Godinez v. Russo (49 Misc 2d 66) the court disagreed with the distinction between legitimate and illegitimate children insofar as the latter in custody matters carried with it the presumption of custody in favor of the natural mother. In awarding custody to the father of the illegitimate child because the mother was unfit, and granting visitation rights *714 to the mother, the court stated that the proper standard is that which is enumerated in section 70 of the Domestic Relations Law regardless of the manner of birth of the child.
I now have before me the determination of the question whether visitation rights are to be granted to the putative father where no family relationship has existed and where the child is only a year old.
My research indicates that this may be a case of first impression. I am led to the conclusion that I must grant reasonable visitation rights. My reasons therefor flow from my feeling that, if the putative father, just as the natural father or the divorced father, lives not too far away and is sufficiently interested enough to be willing to visit the child regularly it will be of great value for the child.
If the father because of shame concerning his failure in a relationship, or painful associations, or fear of being scolded by the mother of the child loses contact with the child, the child will be deprived of love, affection and interest which are essential in his upbringing and character formation.
Furthermore, if the child subsequently finds that one of the parents has lied, he loses some of his faith and conviction about the importance of honesty itself.
Of course, there are people who do not set any great store on honesty and feel that lies are indicated in a situation such as the present. But I think practical experience shows us that the truth rises to the surface. A child brought up with a false story about his father does not stay fooled for very long. He learns the truth and eventually learns to tinker with truth itself after the first shock has worn off. In situations of this kind the parents should try to instill in the child morals and standards possibly a shade higher than their own even though this may be a difficult assignment in today’s materialistic and permissive atmosphere.
The courts of other States have possibly been a little earlier in recognizing the advantage of permitting visitation rights to the putative father unless it was shown that the visits would be detrimental to the best interests of the child.
In the case of Commonwealth v. Rozanski (206 Pa. Super. Ct. 397), the Superior Court of Pennsylvania in determining to overrule previous decisions on the question of granting visitation rights to the putative father, stated that the governing criterion must always be the welfare and the best interests of the child. In affirming an order granting visitation rights to the putative father the court said that the putative father may in many instances instill in the child a sense of stability; he may *715 develop qualities in the child which the mother is uninterested, unwilling or incapable of developing. To the extent that he can perform such a valuable service his presence becomes exceedingly important. The Superior Court wisely concluded that to the illegitimate child the father is not putative.
In the very early 1913 New Jersey case of Baker v. Baker (81 N. J. Eq. 135) the court said that it could not perceive why in a case where the father was contributing to the maintenance of the illegitimate child he had not the right to see the child and determine for himself whether the stipend was being properly administered and why the father should not be permitted to satisfy himself by inspection that the child was being properly clothed and nourished and was receiving a proper education and moral upbringing. The court very properly stated that the child should receive the benefit of the infusion into it at an early age, of the natural love and affection from a parent who is interested in its well-being which might in later years enable it to bear the ignominy of his origin if he had the consciousness that he was acknowledged to be on the same affectionate footing as any other child, and concluded that visitation rights to illegitimate children should be on a par with legitimate children.
Of course, in a case where it can be shown that the visitation privileges would be detrimental to the best interests of the child, even where visitation rights have been granted, the courts have not been reluctant to cancel or revoke the visitation privileges.
It is elementary that visitation rights are always a matter for the supervision of the courts. Should petitioner subsequently find that the father’s presence has had adverse effects on the child’s welfare, it is the privilege as well as the duty of the petitioner to present the facts to the court and if the court, after weighing the evidence, decides that the visitation rights have not been beneficial to the child, it will not hesitate to revoke or restrict the same.
Therefore, the respondent husband shall have visitation away from the home on Sundays from the hours of I :QQ p.m. to 5 :QQ p.m. Notify all parties.