R, PLAINTIFF, v. F, DEFENDANT

Juvenile and Domestic Relations Court
Union County

Decided January 13, 1971

398

Mr. *Eugene Rosner* of the Union County Legal Services Corp., attorney for plaintiff.

Mr. *Joel P. Kraemer* for defendant (*Messrs. Simandl, Leff, Itzikman & Kraemer,* attorneys).

KENTZ, P. J. J. & D. R. Ct. An application has been made to this court to establish the paternity of a child born out of wedlock to one F and to grant reasonable visitation rights to the father.

Two vital questions of law are raised here which heretofore have been undecided in this State. They are whether the Juvenile and Domestic Relations Court has jurisdiction to grant visitation rights not incidental to an order for support, and whether the father of a child born out of wedlock has any right to visitation without the express or implied consent of the mother.

In 1967 a child was born to F. For approximately one year prior to the child's birth the parties in this proceeding cohabited in New York, and either before or slightly after cohabitation commenced a private ritual of marriage was conducted without benefit of license or person authorized by the State of New York to solemnize the marriage. *N. Y. Dom. Rel. Law, McKinney's Consol. Laws* c. 14, § 11. The parties continued to live together as husband and wife, wore wedding rings and were a "family." The father demonstrated a strong interest in and actively cared for the child while the "family" remained together. In May 1969 defendant returned to the home of her parents with the desire to sever contact with

the bohemian style life she and plaintiff had been living. She was determined to escape the environment of her youthful indiscretions and make a fresh start with her child.

When the matter was heard the parties conceded that the child was born out of wedlock and that plaintiff is the natural father of the child. After conceding paternity it was urged by defendant that this court was without jurisdiction to grant visitation in the absence of a claim for support by defendant. With this contention I cannot agree.

■■ The jurisdiction of the Juvenile and Domestic Relations Court is established by statute. *N. J. S. A.* 2A:4–18 states in pertinent part that

The juvenile and domestic relations court shall also have jurisdiction concurrently with such other courts as may have jurisdiction over the matter, to hear and determine in a summary manner disputes and complaints:
a. Involving the domestic relation or the welfare of children, as to which jurisdiction is vested in any court except the superior court or except with respect to the adoption of children or adults.
b. Involving matters of support or temporary custody of children as to which jurisdiction is vested in the superior court.
c. Involving violations of * * * chapter 6 and chapter 17 of Title 9, Children (§ 9:6–1 et seq., and § 9:17–1 et seq.) * * *

In exercising its jurisdiction the Juvenile and Domestic Relations Court is charged with giving paramount consideration to the welfare of the children involved in the matter. See, *e. g., State v. Monroe,* 30 *N. J.* 160 (1959) ; *D. v. D.,* 56 *N. J. Super.* 357 (App. Div. 1959). While the scope of the subject matter jurisdiction of the Juvenile and Domestic Relations Court is restricted to the parameters established by statute, *Amadeo v. Amadeo,* 64 *N. J. Super.* 417 (App. Div. 1960) ; *Tracey v. Tracey,* 69 *N. J. Super.* 382 (App. Div. 1961), the exercise of that jurisdiction once obtained should be liberally construed so that the court may accomplish its purposes, *Wilson v. Wilson,* 86 *N. J. Super.* 61 (App. Div. 1965). Thus, if the statute furnishes some indication of a legislative intention to clothe the court with jurisdiction, an endeavor will be made to effectuate that intention though

the statute may not be free from doubt. *Mattox v. Mattox,* 43 *N. J. Super.* 111, 115 (App. Div. 1956). *Cf. Lasasso v. Lasasso,* 1 *N. J.* 324, 328 (1949), followed in *Bonanno v. Bonanno,* 4 *N. J.* 268, 273 (1950), holding that certain general statutory language conferred upon the court jurisdiction with respect to the support of the wife or children whether or not they are or will be a public charge.

In this case the father of the child seeks a declaration of paternity and visitation privileges. Clearly this court has jurisdiction to establish paternity in bastardy proceedings. *N. J. S. A.* 2A:4–18; *N. J. S. A.* 9:17–1 *et seq. Cf. Borawick v. Barba,* 7 *N. J.* 393 (1951) ; see also, *R.* 5:5–9. Furthermore, under *N. J. S. A.* 9:16–2 and 3 proceedings may be brought in this court by either parent to enforce the statutory duty of both parents to support and educate the child whether he be legitimate or not.

Defendant herein contends that paternity is not an issue since it has been conceded. The result of that concession is not as defendant insists; the concession alone should not be sufficient to deprive a court of jurisdiction in this matter. It is pointed out that had this complaint been brought before the Superior Court, defendant's denial of paternity would, by the same reasoning, deprive that court of jurisdiction. See *Borawick v. Barba, supra.* The jurisdiction of courts should not depend upon a defendant's concessions or denials but upon the substance of the legal relationships involved. The thrust of the complaint in this case is a petition for a declaration of paternity and a determination of the relationship between the father and his illegitimate child.

The father of an illegitimate child is charged by *N. J. S. A.* 9:16–2 with the duty to support and educate the child, and either parent can enforce in this court the obligations established by this section. *N. J. S. A.* 9:16–3. In fact, the father can obtain custody of the illegitimate child in this court. *In re Guardianship of C.,* 98 *N. J. Super.* 474 (J. & D. R. Ct. 1967). Therefore, it is apparent that the relationship between father and illegitimate child is a mat-

ter generally cognizable in Juvenile and Domestic Relations Court.

Defendant argues that under *In re Stevens,* 27 *N. J. Super.* 130 (App. Div. 1953), this court is precluded from granting visitation since that power was held to reside exclusively in the Superior Court. This argument was examined in *Smith v. Smith,* 85 *N. J. Super.* 462 (J. & D. R. Ct. 1964), and *Stevens* was construed to be limited to the facts upon which it was based. As Judge Polow stated in *Smith*:

> The Appellate Division did not rule in the *Stevens* case that the Juvenile and Domestic Relations Court lacks the power, incident to granting an order of support, [as was present in *Smith*] to establish specific hours of visitation for the benefit of the husband and father. In practice, the Juvenile and Domestic Relations Court is expected to and should establish the rights of visitation as an incident to an order granting support of children in appropriate circumstances. [at 470]

See also, 27B *C. J. S. Divorce* § 316 at 516; *Pollock v. Pollock,* 31 *Misc.* 2d 437, 220 *N. Y. S.* 2d 116 (Sup. Ct. 1961).

If visitation can be granted to a father in this court, as the *Smith* case, holds, I see no reason to restrict the availibility of that right to support cases, nor do I think that Judge Polow intended such a limitation. If this court can grant temporary custody, *a fortiori* it can grant visitation in a proper case. The relationship between father and child is of such a nature that the presence of the father, even for short intervals of time, must necessarily have an effect upon the welfare of the child. Indeed, it might be said that the child has a right to see his father.

Since the presence of the father has a significant effect upon the welfare of the child and since this court has jurisdiction over the child for the purposes stated in *N. J. S. A.* 9:16-1 *et seq.* and 9:17-1 *et seq.,* the ultimate consideration being the best interests of the child, I hold that this court must consider visitation by the father to be the natural right of each child. Furthermore, since visitation is necessary for one parent to determine whether his child is being cared for

suitably and educated properly by the person having custody, I perceive sufficient indication of a legislative intent to clothe this court with jurisdiction in matters affecting the welfare of illegitimate children. *Mattox v. Mattox, supra.* Without the opportunity to see the child, *N. J. S. A.* 9 :16–3 becomes useless to the willing parent; visitation must be available to the father in such a case. *Baker v. Baker,* 81 *N. J. Eq.* 135 (Ch. 1913).

By imposing the obligation to support the illegitimate child on the father and allowing him to enforce the parental obligations in this court, the Legislature has established a legal relationship between father and illegitimate child which, although not as complete as the relation between father and legitimate child, is certainly far from that described by the doctrine of *nullius filius.* If, in a proper case, this court can grant custody to the father of the illegitimate child, *In re Guardianship of C., supra, a fortiori* this court can grant visitation in a proper case. The propriety of the case is determined by the welfare and best interests of the child and by the applicable statutes.

It is argued by defendant that *N. J. S. A.* 9 :16–1 precludes this Court from granting visitation in this case. *N. J. S. A.* 9 :16–1 states:

The mother of an illegitimate child, whether married or single, shall have the exclusive right to its custody and control and the *putative* father of such child shall have no right of custody, control or access to such child without the mother's consent. If, however, it is proved that the mother is unfit to have the custody and control of such child, the Superior Court or any other court which may have jurisdiction in the premises may make any order touching the custody or control of such child which might heretofore have been made.

*This section is intended to be declaratory of the existing law upon this subject* and it shall, under no circumstances, be construed as an implication that the rights of such a mother have hitherto been less than as herein above defined. [Emphasis added.]

This statute was signed into law in April 1913. In January of the same year *Baker v. Baker, supra,* was decided and it held that the father of an illegitimate child should have

the right to visit his child subject to the best interests of the child. Defendant contends that *N. J. S. A.* 9:16-1 supersedes and overrules *Baker.* I do not agree.

In *Baker* the father of the child sought reasonable access to his children, one of which was born out of wedlock. The father had been contributing to the support of the children, and Vice-Chancellor Howell stated:

> Why has he not a right to see the children and determine for himself whether the stipend is being properly administered? Why has he not an interest to satisfy himself by inspection that the illegitimate child is being properly clothed and nourished, and that it has a proper home to live in, that care is being taken of its training, its education, and its moral bringing up? The statutes of this state, relative to the custody, care and maintenance of children, are supposed to relate solely to children born in lawful wedlock. Why the principles thus legislated upon do not apply with equal force to illegitimates, I am not able to perceive. [at 137]

The theory espoused in *Baker* is adhered to in the majority of jurisdictions that have examined this issue. See *In re Guardianship of C, supra,* and cases cited therein. In fact, other states have considered New Jersey to be in that majority, citing *Baker* with approval. See, *e. g., Anonymous v. Anonymous,* 56 *Misc.* 2d 711, 289 *N. Y. S.* 2d 792 (Fam. Ct. 1968).

The relationship between *Baker* and *N. J. S. A.* 9:16-1 is challenged by defendant. Certainly a legislative body is presumed to know the prior law, *Magierowski v. Buckley,* 39 *N. J. Super.* 534 (App. Div. 1956), and there is a presumption against useless legislation, *Yanow v. Seven Oaks Park, Inc.,* 11 *N. J.* 341 (1953). Furthermore, a purposeful alteration of the existing law must be attributed to the Legislature. *Tucker v. Frank J. Beltramo, Inc.,* 117 *N. J. L.* 72 (Sup. Ct. 1936). The Legislature, however, expressly stated that *N. J. S. A.* 9:16-1 was *declaratory* of existing law, presumably including *Baker* unless such an interpretation would be contradictory.

Under *N. J. S. A.* 9:16-2 the father of the child in this case is obligated to support and educate his child regardless

of his legitimacy, yet the *putative* father of the illegitimate child has no right of access to the child to determine whether the child needs his support or whether the mother is caring for the child properly.

This apparent conflict in the law has remained unresolved since 1913, and this court is aware of the presumptions of constitutionality afforded to statutes of long standing. *State v. Joas,* 34 *N. J.* 179 (1961) ; *Flynn v. Union City,* 32 *N. J. Super.* 518 (App. Div. 1954) ; *Wilentz v. Hendrickson,* 133 *N. J. Eq.* 447 (Ch. 1943) aff'd 135 *N. J. Eq.* 244 (E. & A. 1944) ; *Legg v. Passaic County,* 122 *N. J. L.* 100 (Sup. Ct. 1939) aff'd 123 *N. J. L.* 263 (E. & A. 1939). However, in matters affecting the rights of infants a more detailed study of the law is warranted to protect the infant. As Andrew Kleinfeld has noted in his recent article, "The Balance of Power Among Infants, their Parents and the State," 4 *Family L. Q* 320 (1970), some areas of the law in regard to infants have been neglected. Kleinfeld states:

In the areas of law where infants traditionally have been unrepresented, many of the rules seem crude and careless with regard to their interests. Yet none of these observations have any validity for areas where infants generally have been represented, such as probate law, where substantive as well as procedural rules regarding infants have been elaborated in the most intricate detail, and statutes have been frequently and meticulously construed. These impressions, if they are correct, suggest that without counsel, rights not only fail to be vindicated; they fail also to be created. A lawyer does not merely present facts to a court in a favorable light; he argues that theories not obviously applicable ought to be used to interpret those facts, suggests previously undiscovered meanings in statutes, and he appeals from court to court for vindication of his theories. The effect of all this is often to create rights where before they lay undiscovered. The right to counsel, then, is not merely one of a panoply of rights insuring fair individual adjudication; it creates a context in which rights stated in case or statute are implemented, and new rights are created. [at 324]

At present the infant involved in a custody or visitation proceeding in this court is not entitled to representation by counsel, although perhaps he should be. *In re Gault,* 387

*U. S.* 1, 87 *S. Ct.* 1428, 18 *L. Ed.* 2d 527 (1967). Since the burden of protecting the infant's welfare is on the court, the infant's rights must also be considered. This court must enforce those rights if it appears that the best interests of the child will be served by such enforcement. This court is the advocate of the child's rights when such child is not represented by counsel, and must evaluate the best interests of the child in electing to enforce those rights or not. Since the court is both the advocate of the infant's rights and the trier of the fact and law, cases involving the best interests issue ought to be weighed with extreme care and the court must be able to distinguish between questions of the infant's rights and questions pertaining to the infant's welfare.

The question of visitation touches both the rights and the welfare of the infant. When *Baker* was decided, the doctrine of *nullius filius* was recognized to a certain extent but the father was allowed visitation since it was deemed to be in the best interests of the child. Citing English law on the subject, Vice-Chancellor Howell stated in *Baker* that:

Animosities between the parents cannot control, because it may well be that they would be detrimental to the best interests of the infant. I think it is much better for the child to have the father visit it at stated times, not only to learn of its continued welfare, but to infuse into it, at an early age, the natural love and affection that it should have for a parent who is interested in its well-being. [81 N. J. Eq. at 138]

See *Queen v. Nash,* 10 *Q. B. D.* 454, 52 *L. J. Q. B.* 442 (1883) ; *Bernado v. McHugh,* [1891] *A. C.* 388. It is significant to note that there was no issue of paternity in the *Baker* case.

Subsequently the Legislature determined that the putative father should have no right of access to the child without the' mother's consent and declared this to be the existing law. *N. J. S. A.* 9 :16–1.

In 1929 the Legislature repealed the doctrine of *nullius filius* by the enactment of *L.* 1929, *c.* 153 (now *N. J. S. A.* 9 :16–2, 3, 4). These sections recognized the parent-child

relationship between the illegitimate child and his natural father. *In re Guardianship of C, supra.*

The construction of *N. J. S. A.* 9:16–1 proposed by the mother in this case would revive the doctrine of *nullius filius* by returning the father to the position of a stranger to his own child. In light of the history of this doctrine, the reasons for which have long since been forgotten, it cannot be seriously contended that it should apply in this case. A close examination of the statute reveals a better solution.

As stated above, there is a presumption against useless legislation. *Yanow v. Seven Oaks Park, Inc., supra.* Therefore, I presume the word "putative" is not to be construed as mere excess verbiage. A putative father is defined as the alleged or reputed father of an illegitimate child. *Black, Law Dictionary* (4th ed. 1951). The Legislature was referring to the person who is accused of being the father or supposed to be the father of the child when it stated that he should have no right of access. *Baker* refers to the father of the child; that is, the natural father of the child. That a person who refuses to acknowledge paternity is to be precluded from having access to the child is the import of the statute. However, the admitted father who shows an active interest in the child's welfare should not be classified as a "putative" father. The fact that the amendments made in 1929 (now *N. J. S. A.* 9:16–2, 3, 4) impose the obligation to support the illegitimate child on the father, and not on the "putative" father, lends support to this interpretation. It should be noted that among the minority of jurisdictions which deny custody to the father, the Texas and New Mexico courts stated that their decisions were based on the fact that there was no correlative duty to support the child in those states. *Ex parte Wallace,* 26 *N. M.* 181, 190 *P.* 1020 (Sup. Ct. 1920); *Home of Holy Infancy v. Kaska,* 397 *S. W.* 2d 208 (Tex. Sup. Ct., 1966). It would seem that some remnants of the *nullius filius* doctrine still survive in those jurisdictions; the same may have been the case in this State in 1913 when *Baker* was decided, however, the court pointed out

that the father was contributing to the support of the child in that case.

In order to enforce the obligations imposed by *N. J. S. A.* 9:16–2 it is necessary to show that the putative father is actually the child's natural father. *B v. O,* 50 *N. J.* 93, 97 (1967); *M v. F,* 60 *N. J. Super.* 156 (App. Div. 1960). Once the putative father is determined to be the natural father and the duty of support attaches, he is no longer to be considered "putative" but simply the father.

Such a determination need not be through a formal bastardy proceeding but may be by voluntary admission. *In re Guardianship of C, supra.* As the Court of Appeals of Ohio stated in *French v. Catholic Community League,* 69 *Ohio App.* 442, 44 *N. E.* 2d 113 (Ct. App. 1942):

> To say that such a father must first, by a public spectacle in a bastardy proceeding, acknowledge paternity or be adjudged the reputed father of the illegitimate child, before he can be considered the child's father and in his order entitled to the child's custody, is to require the doing of a useless and rather despicable thing. The public parading of the sexual misstep is not conducive of the infant's welfare or its peace of mind after it passes adolescence. It cannot enlarge the father's sense of responsibility. It might deter him from performance of his moral and legal duty. The question comes: Why require one to prove that which he freely admits? Such a course is far from the rule of modern practice. [at 114–115]

The fact that the parties lived together, holding themselves out as husband and wife, lends credence to the asserted paternity, and also raises the possibility of implied consent. A similar course of conduct over a period of 15 years has been held to constitute consent for the purposes of the statute in the recent case of *M v. M,* 112 *N. J. Super.* 540 (J. & D. R. Ct. 1970). The conduct of the parties in this case might constitute such consent, but such a determination would still recognize some vestiges of the *nullius filius* doctrine which I do not believe exists in New Jersey today. Furthermore, the situation in *M v. M, supra,* is readily distinguishable from the present case; *M v. M* dealt with a relationship closely akin to the common-law marriage where

the parties lived together over a long period of time holding themselves out as husband and wife. The relationship here appears to be more temporary and casual.

In any case involving the custody of children the courts are always to be guided by the best interests of the child. *Fantony v. Fantony*, 21 N. J. 525 (1956) ; *Lavigne v. Family and Children's Society of Elizabeth*, 11 N. J. 473 (1953) ; *Salmon v. Salmon*, 88 N. J. Super. 291 (App. Div. 1965) ; *In re Mrs. M*, 74 N. J. Super. 178 (App. Div. 1962) ; *Sheehan v. Sheehan*, 51 N. J. Super. 276 (App. Div. 1958). The same is true for applications for visitation. *Baker v. Baker, supra*. The love and affection of the father is an important part of the child's life, no matter what the technical legal relationship is said to be. As this court stated in *In re Guardianship of C, supra*:

> The public policy of this state is to keep legitimate children with their natural parents unless they are unfit or have abandoned the child. This is so even though strangers could provide a better home. There are, no doubt, many reasons for this policy but among which can be seen a judicial realization that natural parents would have a vital interest in the welfare and best interests of their offspring. This vital interest, based on a biological inheritance of flesh and blood, will make the parent retain his concern during times of frustration, which on occasion arise in all parent-child relationships where one named the parent by adoption papers may yield to the pressure to forget the child. Can it be argued that this bond of blood is any less strong where the child was born out of wedlock? Love can neither be created nor destroyed by law. The love between a parent and his child is universal to humanity; it is not governed by the local laws of marriage and legitimacy. Can it be said a father loves his child only when he is married to the child's mother? [at 492 of 98 N. J. Super.]

 The evidence presented to this court indicates that this child was not the product of a rape or an act of prostitution. In fact, quite the contrary has been established. These parents lived as a family and shared the responsibilities of bringing up their child. For some reason, they chose not to marry. The child of these parents has a right to know his father and his mother; a right to share in the affection of

both parents. These rights are meaningless unless they can be enforced in a court. The right of the child to the love and affection of both parents, the right to have both parents caring for and protecting the child, in fact, the right to have both parents living together must be considered by the courts since the child himself has no other representation. If effective enforcement of these rights can only be accomplished through the application of a partial remedy such as visitation, and it would be in the best interests of the child to elect such a remedy, this court must not deprive the child of his right to have the parent visit him. See *Fiore v. Fiore*, 49 *N. J. Super.* 219, 228 (App. Div. 1958), certif. den. 28 *N. J.* 59 (1958).

Since these rights are of such a fundamental nature I believe that they would be protected by the due process clause of the Fourteenth Amendment of the United States Constitution. To the extent that *N. J. S. A.* 9 :16–1 infringes upon these rights it is unconstitutional on its face and void. A construction of the statute which would deprive the child of his right to see his father, or deprive the father of his right to see his child, is so arbitrary and capricious as to deny the child and his father equal protection of the law. However, as stated above, I interpret the statute to prohibit access to the child only in the case of the person supposed to be the father. Such an interpretation involves no constitutional question since the reputed or putative father stands in the same position as a stranger. He therefore has no duty to support the child until he is determined to be the natural father, and consequently has no right to custody, control or access to the child. Whether the child may enforce his right to compel a determination of paternity is not before me in this case.

I conclude that visitation rights may properly be granted to the father if it is determined that such visitation would be in the best interest of the child.

A further hearing on the best interest issue will be held.