Hugh R. Elwyn, J.
The petitioner, Franklin Pierce, the acknowledged father of an illegitimate child, seeks to have defined and enforced his asserted right to visitation with his five-year-old daughter, which right the mother has, for the past year and a half, adamantly refused to recognize.
Custody of the child is not at issue. What is at issue is whether through de-emphasis of parental rights (see Finlay v. Finlay, 240 N. Y. 429, 433-434) and strict adherence to the “ best interests of the child ” criterion as conceived and defined by the mother alone, the court should permit the mother as custodial parent the prerogative of making the determination as to when and under what circumstances, if at all, the child may see her father, as is urged upon the court by her expert witness, or whether, the court should exercise its authority as parens patriae to temper the “ best interests of the child ” maxim with a recognition that the father of a child, even though illegitimate, has a right to association with his child which right may not only not be ignored (Meyer v. Nebraska, 262 U. S. 390, 399; People ex rel. Portnoy v. Strasser, 303 N. Y. 539; People ex rel. Kropp v. Shepsky, 305 N. Y. 465; Matter of Jewish Child Care Assn. [Sanders], 5 N Y 2d 222; People ex rel. Anonymous v. Anonymous, 10 N Y 2d 332; People ex rel. Scarpetta v. Spence-Chapin Adoption Serv., 28 N Y 2d 185; Matter of Spence-Chapin Adoption Serv. v. Polk, 29 N Y 2d 196), but which is cognizable and, indeed must be recognized, bv the courts (Stanley v. Illinois, 405 U. S. 645).
Since the decision of the United States Supreme Court in Stanley v. Illinois (supra), holding that the interest of the father of an illegitimate child in retaining custody of his child is cognizable and substantial, and that to deprive him of the child’s custody without a hearing as to his fitness as a parent was a denial of the equal protection of the laws guaranteed by the Fourteenth Amendment, the rights of the unwed father have come under renewed scrutiny by the courts. The result has been to broaden and liberalize the unwed father’s rights through *615 either ignoring and judicially amending or even holding unconstitutional statutes which deny or restrict his rights. For instance, in spite of the unequivocal affirmation by the Appellate Division (2d Dept.) in “ Doe ” v. “ Roe ” (37 A D 2d 433, 436) that “ Under New York law the putative father has no parental rights with respect to a child born out of wedlock ’ ’ the Supreme Court, Dutchess County in Doe v. Department of Social Servs. of City of Poughkeepsie (71 Misc 2d 666, 671) has held that “ in view of Stanley, there must now be read into that statute [Domestic Relations Law, § 111, subd. 3, which provides that only the mother’s consent is necessary for the adoption of a child born out of wedlock] and it must be so construed, that the mother’s exclusive or sole consent suffices only where there has been no formal or unequivocal acknowledgment or recognition of paternity by the father.” The putative father was held to have a “cognizable and substantial interest” in the matter of the proposed adoption of his child.[1] (p. 671). Certainly, in the light of Stanley v. Illinois (supra) there can no longer be any question but that the father of an out-of-wedlock child has standing to be heard on the issue of visitation rights (Forestiere v. Doyle, 30 Conn. S. 284).
The courts of this State have undoubted authority to grant visitation rights to the father of an illegitimate child (People ex rel. ‘‘ Francois ” v. “ Ivanova ”, 14 A D 2d 317; Anonymous v. Anonymous, 34 A D 2d 942; Family Ct. Act, §§ 511, 549) and, in a proper case, have frequently recognized the right of a father *616 to visit his illegitimate child (see, e.g., Matter of “ Z ” v. “ A ”, 36 A D 2d 995 [remitted to Family Court for consideration of visitation rights]; Anonymous v. Anonymous, 34 A D 2d 942, supra [remanded for additional evidence]; People ex rel. “ Francois ” v. “ Ivanova ”, supra [granted]; Matter of Anonymous v. Anonymous, 56 Misc 2d 711 [granted]; Matter of Anonymous, 12 Misc 2d 211 [granted]; Matter of Cornell v. Hartley, 54 Misc 2d 732 [granted if mother consents]; cf. E. R. v. D. T., 77 Misc 2d 242 [right of father to visit in appropriate case recognized and approved, but because of special circumstances denied]).[2]
The child Joanna, who is now five years of age lives with her mother and stepfather at Lake Katrine, New York. She was born on December 29, 1968 in North Miami, Florida and lived with both parents until she was approximately two and three quarters years old when her unmarried parents separated. During this period of time the petitioner had almost dailv contact with his daughter, lavished much time, attention and affection upon her and she came to know and love him as her father.
The parties’ relationship began when the petitioner hired the respondent as his secretary. This relationship gave way to a more intimate relationship when, after about six months, the respondent moved into the petitioner’s house in late February of 1968. They continued to live together without marriage in a husband and wife relationship until, one dav in September of 1971, after a violent argument, the respondent decided she could no longer tolerate the situation and moved out. taking the child with her.
The respondent claims that when she moved in with the petitioner, she did not know that he was married and did not learn of that fact until three or four months after Joanna was conceived. She also claims that at the time she moved in with him the petitioner asked her to marry him. that thev discussed having a child and that she became pregnant assuming that they would soon marry. After the conception and birth of the child *617 and np until the time of the separation on September 27, 1971 the respondent continued to press the issue of marriage, but he refused to marry except upon his terms. Whenever the subject of marriage came up, no decision could ever be reached, for the respondent wanted a marriage with no strings attached and the petitioner insisted that there should first be a prenuptial agreement. As a matter of fact, however, during all of this time the petitioner was not legally free to marry, for it was not until April 4, 1972 that he obtained a divorce from his wife in the State of Florida.
Shortly after the respondent left the petitioner’s home in Florida in September, 1971 she moved to Charlottesville, Virginia. The petitioner did not see the child again until January, 1972 when the respondent and the child visited with the petitioner for several weeks at his home in Florida. Twice during the spring of 1972, once in March and again in June the petitioner went to Charlottesville where, with the mother’s permission and encouragement, he spent several weeks visiting his daughter. The mother and child stayed at the petitioner’s home in Florida for two weeks in April, 1972 and, with the mother’s permission, the child spent a portion of July and all of August with her father at his Florida home. Shortly after the child’s return to Charlottesville in September, 1972, there appears to have been a complete reversal in the mother’s attitude toward further visits with the father, for although he made repeated efforts to communicate with the child, he was not permitted to see his daughter again until April of 1973 when he again went to Charlottesville, where for the next month he had a limited contact with his daughter. After May 31 the respondent permitted the father no further contact with his daughter and he did not again see the child until October 1973 when, through the intervention of the court, he was permitted to see the child at the mother’s apartment at Lake Katrine, New York. From May to October he had made numerous attempts through correspondence and by telephone to re-establish some contact with his daughter, but all his efforts were met by a complete denial by the mother, for the ostensible reason ‘ ‘ that no formal agreement had been reached and until such formal agreement could be reached she didn’t think it was a good idea to see the child.”
In the meantime, while the petitioner was continuing his diligent efforts to maintain contact with the child, he also renewed his efforts to effect a reconciliation with the respondent and to make provision for the child. On November 18, 1971, *618 about two months after their split up he wrote to the respondent asking that he be permitted to have legal custody of the child with unlimited rights of visitation for her. The offer was declined. On January 6, 1972 the petitioner renewed in writing his long-standing offer of marriage so as to legitimatize the child but again, as always, coupled with a condition that she enter into a prenuptial agreement waiving any interest in his estate. This offer was likewise declined.
Finally, when after all efforts to persuade the respondent to marry upon his terms had failed and every effort to maintain contact with his daughter had met with denial, the petitioner in the spring of 1973 commenced a proceeding in the Juvenile and Domestic Relations Court in Charlottesville, Virginia to obtain custody and/or visitation rights with his daughter. After lengthy hearings a decision was rendered on June 18, 1973 by the Judge of that court who, relying on the authority oí Stanley v. Illinois (405 U. S. 645, supra) granted the petitioner reasonable visitation rights. On June 21,1973 a restraining order was obtained from a Circuit Court Judge restraining the petitioner from visiting his daughter pending the appeal. A notice of appeal was served with the restraining order, but the appeal was never perfected.
While the Virginia court proceedings were pending appeal the respondent on July 30, 1973 married Raymond Yerkovich and moved to the State of New York where she now resides with her husband, her daughter Joanna, and a child recently born of her marriage to Yerkovich. Since the child and her mother are now residing in the County of Ulster, State of New York, this court has jurisdiction to entertain this proceeding and takes note of the legal proceedings heretofore had in Virginia only by way of chronicling events, for this court is in no way bound by the proceedings heretofore had in the Virginia court. The full faith and credit clause of the United States Constitution does not apply to custody decrees (Halvey v. Halvey, 330 U. S. 610; May v. Anderson, 345 U. S. 528; Ford v. Ford, 371 U. S. 187; Matter of Bachman v. Mejias, 1 N Y 2d 575; Matter of Berlin v. Berlin, 21 N Y 2d 371, cert. den. 393 U. S. 840; People ex rel. Pritchett v. Pritchett, 1 A D 2d 1009, affd. 2 N Y 2d 947; Matter of Hicks v. Bridges, 2 A D 2d 335; Matter of Lang, 9 A D 2d 401, affd. 7 N Y 2d 1029; People ex rel. Sloane v. Sloane, 20 A D 2d 862, affd. 15 N Y 2d 561; Matter of Metz v. Morley 29 A D 2d 462; Gaukel v. Gaukel, 35 A D 2d 1056; People ex rel “ XX ” v. “ ZZ ”, 43 A D 2d 196). In passing, it is worthy of note, however, that during the course of the Virginia litigation, the netitioner renewed his *619 offer of marriage, this time unconditionally, but the offer was again refused.
In addition to demonstrating through his persistent efforts to maintain contact with his daughter his deep emotional attachment for the child, the petitioner has also demonstrated his willingness and substantial ability to provide for her financial security. He has created for her benefit an irrevocable trust consisting of $80,000 face value municipal bonds, having a market value of $58,878 which produces $3,065 per year tax-exempt income; has transferred to the trustees of a revocable living trust of which his daughter is the beneficiary his residence at Golden Beach, Florida, and by his will devised the residue of his estate to the trustees of the living trust.
After the respondent married and moved to New York State, the petitioner, through the intervention of the court, was permitted to see his daughter at her mother’s home in the presence of the mother and stepfather on four occasions in the fall and winter of 1973-1974. On the occasion of each visit, with the exception of the second, when the child was warm and friendly to him, the father found his daughter withdrawn arid hostile. When he attempted to talk to the child, she Avould cover up her face with her hands, hide her face in a corner or bury her head in the bed and refuse to talk. When the father called at the mother’s home shortly before Christmas to present the child Avith gifts of a coat and a doll house, the child said she did not need a coat and evinced no interest whatever in the doll house. On another occasion the child said that her mother had told her not to talk to him, that he was not her daddy. When asked who then he was, she replied that he was a dirty rat and asked him to leave.
From the history of the relationship of these parents it is obvious that the child was not born of a casual relationship, but of one which endured for over two and a-half years, and one in which, even after separation and up until shortly before her marriage, contact between father and daughter was actively encouraged by the mother. It is equally apparent that up until the time of the mother’s marriage, when the child’s attitude toward her father completely changed, that father and child enjoyed a mutually rewarding warm, loving father and daughter relationship.
Twice during the course of this lengthy proceeding which was begun in October, 1973, the court on application of the petitioner permitted him to take his daughter for visits to his home in Florida, the first time for two weeks in April, 1974 and the *620 second time for a month in July and August, upon condition that he post a cash bond in the amount of $10,000 to insure the return of the child to the mother’s home and the jurisdiction of the court. In each instance the petitioner readily complied with the condition and the child was returned to the mother’s home at the appointed time.
At no time has there been any suggestion that the father is not a fit and capable custodian of his daughter or that when she has been temporarily in his custody is anything but well cared for. Indeed, the photographic evidence in this case shows that when the child has been in the father’s custody she has been pampered with every luxury and attention a doting father can bestow.
The court is completely satisfied that the petitioner is in all respects a wholly suitable and proper person to have the temporary care and custody of his daughter, even for an extended period of time. He has, through the creation of substantial trusts for the benefit of daughter, demonstrated his concern for her financial security and he has on two separate occasions demonstrated to the court his financial responsibility. More importantly, he has also demonstrated his complete trustworthiness.
Thus, a decision in this case does not turn upon the fitness of either parent to be permanent or temporary custodian of the child, but rather upon whether in ‘ ‘ the best interests of the child ” she should be permitted some periodic association with her father, or whether, as the mother would have it, she should be shielded from all further contact. To assist in resolving this issue both parties presented the testimony of psychiatrists.
Dr. Bernard F. Kalina, a psychiatrist of Liberty, New York, was called as a witness on behalf of the petitioner. Dr. Kalina who had examined the child at his office on March 12, 1974, pursuant to court order, testified that he found the child to be very intelligent and bright with no mental disorders whatever. He expressed the opinion that the child loves her father; he thought that the child’s negative feeling toward the father had developed because of the negative things the mother had said about the father and explained the child’s change in attitude toward father by sayingI feel her reactions would have to be negative since she loves Mommy and wants to please Mommy. If Mommy has said something negative about Franklin, certainly, in the presence of Mommy, she would have to act negatively,”
*621 Dr. Kalina further expressed the opinion that substantial visitation rights for the father ‘ ‘ would be beneficial to the child. It would be especially beneficial if Mommy could be supportive of the visit. In terms of her growth and maturity, and she does, in my opinion, love Franklin and sharing these feelings towards one another would only lead to her growth about her feelings.” The psychiatrist could see no reason why substantial visitation would be harmful to the child; on the contrary, he felt that a denial of further visits would in fact have a negative effect upon the child because the child would then feel rejected and confused and was firmly of the opinion that the child would benefit from such visits because such visits would be ‘ ‘ important for her whole growth, mental, physical and spiritual.”
With respect to the mental health of the father, Franklin Pierce, Dr. Kalina said ‘‘ he is emotionally stable and is free of any psychiatric disorders. He is fully capable of having substantial visitation, physically and emotionally, both.”
The respondent for her expert witness produced Alfred J. Solnit, Sterling Professor of Pediatrics and Psychiatry at Tale University School of Medicine and Director of the Yale University Child Study Center, who, with Joseph Goldstein and Anna Freud, is a coauthor of the recently published book, Beyond the Best Interests of the Child.[3]
Professor Solnit conducted a clinical examination of Joanna on two occasions at the Yale University Child Study Center. To paraphrase and summarize his testimony, Professor Solnit said that it was clear to him that the child knew Mr. Pierce, but that she was uncomfortable talking about him and did not like to use his name. She explained that she wished he would not try to visit her and that he would not try to take her away from home, from her mother and father. She did not .say she disliked him, but indicated that she was uncomfortable with him, anxious would be my technical term for it, but that it made her feel bad and she wished he would not try to come see her and take her away.
*622 Thus, the Professor said he found the child apprehensive and anxious and that it was his impression that .she is under extraordinary tension. “She is anxious and she is insecure because of the experience she’s had in which the visits of Mr. Pierce are felt as a threat to her and are not comfortable for her especially because she had to leave home to visit Mr. Pierce soon after a new baby had arrived in her family. I think that made her very uncomfortable and uncertain and insecure ’ ’.
Based upon these clinical observations, the Professor then stated that “ in [his] opinion, Joanna’s best interest would be served if she could feel that Mr. and Mrs. Yerkovich were her parents as parents with all the rights and privileges of parents. That is that they could determine not only what medicine she should have, and what school she should go to but whom she should visit and with whom she should visit. In other words, I believe that she should not have the feeling that they lack the authority or the ability to give her this security, of feeling wanted and permanent in her family. Therefore, I would advise that full custody be given to Mr. and Mrs. Yerkovich, if we are talking about the psychological and emotional interests of Joanna ”.
When asked what might happen to the child in the event of a continuance of visits from her father, the Professor answered: ‘ ‘ My impression is that her anxiousness would interfere with the full elaboration of her development * * * and her ability to think and to relate to people * * * she is not frightened of Mr. Pierce, she is frightened of losing contact with her family ’ ’. Finally, he said that if the visits with the father were continued he would be apprehensive about her development because ‘ ‘ her ability to relate to other people will, I think, be at risk with this being caught up in the continuation of this conflict about visitation ”.
In short, the Professor’s thesis, although variously stated, is that it serves the best interests of the child, with the least detriment, to have the custodial parent, the one with whom the child lives, rather than a court, make the determination as to when and under what circumstances, if at all, the noncustodial parent should be permitted visitation with their child.
This is indeed, a novel and startling doctrine, and if accepted literally as Professor Solnit and his coauthors Goldstein and Freud seriously urge, would leave the court shorn of much of its traditional role as parens patriae and guardian of the child’s best interest. Quite frankly, I do not believe that the law of this State would tolerate this court, charged as it is with a responsibility for the welfare of children, so supinely and abjectly *623 abdicating its function to any parent, however well intentioned. The danger and folly of such a course is aptly illustrated by the circumstances of this case wherein a mother, who once permitted and actively encouraged free association between father and child, has, upon the contraction of a marriage, arbitrarily reversed her field and is now unwilling to permit any contact whatever between her daughter and the man who is the father of her child. The mother’s change in attitude has, of course, been reflected in the child’s attitude toward her father. The child, who was once outgoing, warm and loving, has become withdrawn, apprehensive and anxious and has on occasion referred to her father as a dirty rat. Such a change in a five-year-old child’s attitude toward her father could only have been brought about through her mother’s influence. Although she would no doubt deny it, the court can only conclude that the mother, consciously or unconsciously, now sees any enforced further association with her former paramour as an unwelcome reminder of her past indiscretion and as a threat to the stability and security of her marriage.
Consequently, the court totally rejects the specious notion so ingenuously urged by Professor Solnit and his coauthors that the custodial parent should have the sole right to determine in the name of the best interests of the child whether the noncustodial parent should be permitted or denied association with his own child. Experience and common sense teach that, given the imperfections of human nature from which flow the bitterness and resentment which all too often accompany a marital or illicit love affair breakup, no one parent can, under such circumstances, be safely entrusted with a power so susceptible of abuse. The authors ’ solution to the frictions engendered by the selfish desires of separated parents envisions an unattainable ideal wherein the custodial parent always acts from the purest, noblest and loftiest motives and never from selfish, base or crass ones. Until such time as that ideal is more nearly approached than experience shows is presently the case, this court will retain its prerogative of making decisions, however difficult and freighted with potential for good or ill in cases involving the lives and the welfare of its wards.
Thus, we approach the central vital issue in this case. Is it in this child’s best interest to be shielded by the mother from all future contact with her father, except through the mother’s sufferance, or do her best interests require that she should through her formative and growing up years have some continuing association with a father who has amply demonstrated *624 his love and concern for his daughter? I have no doubt that Professor Solnit’s clinical observations of the child wherein he found her to be apprehensive and anxious are accurate. Any sensitive child, positioned as is Joanna between two parents who are vying for her love and attention could not be otherwise caught, as she is, between her conflicting loyalties. However, I do not believe that the remedy for relieving Joanna of her tensions and anxieties lies in isolating the child from all further contact from her natural father but rather, as Dr. Kalina suggested, that the mother encourage and be supportive of the father’s visits.
Any analysis of this situation brings one back to a fundamental truth which the psychiatrists, with all their talk of the psychological parent, have a tendency to overlook. Joanna, as is everyone, was born of two parents and, in my judgment, neither one has any God-given exclusive right to control her destiny.
The concept of psychological parenthood should never be permitted to obscure the truth that ‘ ‘ the natural father, as well as the natural mother, remains a parent no matter how estranged parent and child may become. A stranger may by conduct become a foster parent; but no conduct may transmute a natural parent into a stranger.” (Baumet v. United States, 344 U. S. 82, 85 [Douglas, J., dissenting in part].)
In spite of the circumstances of her birth, Joanna will one day have to come to grips with the fact that she does indeed have a father. As Dr. Kalina said, “ Joanna will have to understand that father really exists as she grows older and learns to decide for herself ’ ’. In the interim, he said, ‘ ‘ It would be harmful if she wasn’t allowed to see both parents ”.
The special guardian in her report to the court makes essentially the same point when she says that the mother’s refusal of all visitation rights to the father ‘ ‘ raises the question, not touched upon by the litigants, herein, of whether a child has a right to get to know and appreciate who her father is ”. She goes on to say: “Joanna’s mother has admitted that Joanna does not know the circumstances of her birth, but the time will come when she must know. The real question is whether it will be too emotionally upsetting to Joanna to have the petitioner seeing her on a regular basis.”
From her considerable personal contact with the child and both parents, the special guardian reports that she has ‘ ‘ come to the conclusion that the respondent finds any contact whatsoever with the petitioner both distasteful and very upsetting and *625 there is no question that this is communicated to her, whether consciously or not, to Joanne who is in turn upset and uneasy over the situation.”
The special guardian concludes: “ I am unable to accept Dr. Solnit’s position which accords a father no rights whatsoever concerning his child if the mother determines that he should have none. I feel that if this is the case, somewhere along the line in her growth and development Joanna will be asking herself and those around her ‘ who am I ’ and ‘ where did I come from ’ and ‘ what is my father really like? ’ I feel that Joanna has a right to know and appreciate who her father is and what kind of a person he is, good or bad. On the other hand, I feel that it would serve no useful purpose to allow the petitioner such frequent visitation as to disrupt the peace, security and stability of the Yerkovieh household.
“ Joanna is a child of tender years and I agree with Dr. Sol-nit when he says that she has a need for stability and security. Also, the fact that she is attending school now effectively prevents any visitation which will interfere with same.”
It is the recommendation of the special guardian that the petitioner be granted limited visitation with the child away from the Yerkovieh household but in the local area. She advises against further visitation of Joanna in Florida as too remote and disruptive for a child of her years and that too frequent visits would be too upsetting to the mother, and therefore, to Joanna. She further advises against permitting the petitioner to take the child away from home at crucial times such as Christmas and other major holidays. In short, visitation should be limited in time and scope.
The court finds itself in accord with the views and recommendations of the special guardian. I do not share the fear of Professor Solnit that further contact of the child with her father will interfere with her development and her ability to think and relate to people. On the contrary, I fear that deprivation of future association with her natural father is more likely to stunt and warp her maturation and development as an emotionally stable adult. Her ability to think and relate to people is not going to be enhanced by shielding her from contact with them.
I hold these views because I am persuaded that in this particular case this father through his precept, counsel and example has much of value that he can contribute to the molding and shaping of his daughter’s character and personality and that to deprive her of all association with her father, who has amply *626 demonstrated his love and concern for her, would not be in her best interests.
The court is aware that when visitation is renewed by the father such visits may cause the child some temporary emotional upset and perhaps some disruption of the Yerkovich household, but this is a price that must be paid if the child’s larger long-term interests are to be best served. Any emotional upset to this child occasioned by the presence of her father could be minimized if the mother would recognize the reality of the child’s origins and be supportive of the tie that binds father and child together.
The willingness of the court to afford this father an opportunity to permit Joanna to come once again to know, love and respect him as her father should not be regarded as novel. In fact, it but reflects the ancient wisdom of God’s law as given to Moses on Mount Sinai wherein as the Fifth Commandment of the Decalogue it is written: [1] ‘ Honour thy father and thy mother: that thy days may be long upon the land which the Lord thy God giveth thee.”
Consequently, in the exercise of discretion, the father is hereby accorded the right and privilege of visiting with his daughter Joanna on alternate weekends, a weekend being defined as from Friday evening at 5 p.m. to the following Sunday evening at 7 p.m., such visitation to take place away from the Yerkovich household and within the State of New York. In addition, the petitioner may have the temp or ay care and custody of his daughter for one month during the period from June 30 to September 1 of each year, with travel unrestricted.
Inasmuch as the petitioner has not been accorded the privilege of seeing his daughter .since the summer of 1974, he is accorded the right and privilege of having his daughter with him on the weekend of December 20-22, and on alternate weekends thereafter.

. Even before Stanley V. Illinois (supra) the distinction between the rights of legitimates and illegitimates and the rights of their parents had become increasingly attenuated as the result of recent United States Supreme Court decisions which recognize the right of an illegitimate child to recover for the wrongful death of his mother (Levy v. Louisiana, 391 U. S. 68) and the mother to recover for the wrongful death of her illegitimate child (Glona v. American Guar. Co., 391 U. S. 73). Consequently, New York courts have broadened the concept and have also recognized the right of illegitimate children to share in the distribution of damages recovered in an action for the wrongful death of their putative father (Matter of Ortiz, 60 Misc 2d 756; Matter of Ross, 67 Misc 2d 320; Matter of Perez, 69 Misc 2d 538; Matter of Johnson, 75 Misc 2d 502) as have the courts of New Jersey (Schmoll v. Creecy, 54 N. J. 194) and Louisiana (Levy v. Louisiana, 391 U. S. 68, supra, on remand reported in 253 La. 73); the right of illegitimate children to share in the proceeds of a life insurance policy where the insured had failed to designate a beneficiary (Prudential Ins. Co. v. Hernandez, 63 Misc 2d 1058) and the right of a putative father to maintain an action for the wrongful death of his illegitimate child (Holden v. Alexander, 39 A D 2d 476). However, distinction between the right of the legitimate and illegitimate child to inherit in intestacy may constitutionally be preserved (Labine v. Vincent, 401 U. S. 532; Matter of Hendrix, 68 Misc 2d 439; Matter of Belton, 70 Misc 2d 814).

. It is conceded, however, that there are cogent social considerations militating against the granting of visitation privileges to the father of an illegitimate child (see dissenting opn.. Carswell, J. in People ex rel. Meredith v. Meredith, 272 App. Div. 79, 87-90. affd. 297 N. Y. 692: and dissenting opn.. Breitel, J. in People ex rel. Francois v. Ivanova, supra, pp. 318-323). There may also he persuasive reasons for permitting visitation privileges with the illegitimate child (see dissenting opn.. McGivern. J.. in Anonymous v. Anonymous, 34 A D 2d 942, 943-945, supra: and opn. Marano. J.. in Matter of Anonymous v. Anonymous, 56 Misc 2d 711, 714-715, supra and cases there cited).

. Professor Solnit’s testimony at the trial coincided with and reinforced this passage from the book (p. 38) which succinctly states his essential position with regard to the issue in this case. “ Once it is determined who will be the custodial parent, it is that parent, not the court, who must decided- under what conditions he or she wishes to raise the child. Thus, the noncustodial parent should have no legally enforceable right to. visit the child, and the custodial parent should have the right to decide whether it is desirable for the child to have such visits. What we have said is designed to protect the security of an ongoing relationship — that between the child and the custodial parent.”