442 So.2d 506 (1983)
Sheila Fry Fouchi, wife of Frank E. FOUCHI
v.
Frank E. FOUCHI.
Frank E. FOUCHI
v.
Sheila Fry FOUCHI.
Nos. 82 CA-213, 82-CA-214.
Court of Appeal of Louisiana, Fifth Circuit.
November 9, 1983.
Rehearing Denied January 17, 1984.
Writ Denied February 27, 1984.
*508 Joan B. Montero, Metairie, for Sheila Fry Fouchi Hornbostel, plaintiff-appellee.
Adelaide Baudier, Metairie, for Frank E. Fouchi, defendant-appellant.
Catherine Quaid, intervenor, in pro. per.
Donald Eppling, intervenor, in pro. per.
James L. Valicenti, intervenor, in pro. per.
Before CHEHARDY, KLIEBERT and BOWES, JJ.
CHEHARDY, Judge.
This appeal arises from a bitterly-disputed community property partition between Frank E. Fouchi and his former wife, Sheila Fry Hornbostel. The proceedings, on January 6 and 7, 1982, combined traversal of the inventory with trial on the merits of the partition. Mr. Fouchi has appealed, as have three intervenors, Catherine Quaid, J.L. Valicenti and Donald Eppling. (The fourth intervenor, W.C. Moore, died shortly before trial of this matter and no succession representative has been substituted for him.) Mrs. Hornbostel has answered the appeals, seeking damages for frivolous appeal.
Quaid, Eppling, Valicenti and Moore all intervened in the partition suit to recover on promissory notes they alleged were debts of the community. The judgment dismissed their demands. On appeal, Mr. Fouchi seeks first to have the judgment annulled. Alternatively, he desires to have the debts to the intervenors included in the inventory as community debts. He also appeals the trial judge's finding that the value of the former community home was $55,000; Mr. Fouchi contends the value is less. In addition he appeals the finding of the trial judge that he is liable for the value of silver flatware found missing from the family home when an inventory of the community was taken after the Fouchis separated. Finally, he contends Mrs. Hornbostel owes reimbursement to the community for funds allegedly "siphoned off" into her separate account. Quaid, Eppling and Valicenti have appealed the dismissal of their claims.

Nullity of the Judgment
The threshold issue raised by Mr. Fouchi is the validity of the judgment per se. He contends it is null because the district court judge who presided at the trial had become an appellate court judge by the time he signed the judgment.
The usual procedure to annul a judgment is by a direct action brought in the trial court. LSA-C.C.P. art. 2006. Nonetheless, the jurisprudence has held that where the judgment attacked is an absolute nullity, it may be attacked collaterally and in any court. Franz v. Franz, 315 So.2d 79 (La.App. 4th Cir.1975), and cases cited therein. Such a collateral attack, however, must be predicated on defects patent on the face of the record. Decuir v. Decuir, 105 La. 481, 29 So. 932 (1901); Amer. Bank & Tr. Co. v. Marbane Inv., Inc., 337 So.2d 1209 (La.App. 3rd Cir. 1976).
"No principle of law has received greater and more frequent sanction, or is more deeply imbedded in our jurisprudence, than that which forbids a collateral attack on a judgment or order of a competent tribunal, not void on its face ab initio. [Citations omitted.]" Nethken v. Nethken, 307 So.2d 563, 565 (La.1975).
Because the ground for the nullity asserted here, the capacity of the trial judge to sign the judgment, does not appear in the record, we conclude the proper forum for appellant Fouchi to assert the nullity action is the district court, where he may *509 present evidence of the alleged nullity in a direct proceeding.
With this threshold question surmounted, we face the merits of the substantive issues. Mr. Fouchi's brief is lengthy and raises many issues. Examination of the judgment discloses, however, that many of these disputed points were actually decided in Mr. Fouchi's favor and are now moot, because Mrs. Hornbostel did not challenge the trial court's dispositions in her answer to the appeal. The only issues remaining are the validity of the intervenors' claims against the community, the valuation of the family home, whether the disappearance of the silver items Mrs. Hornbostel claims were in the home when she moved out should be assessed against Mr. Fouchi, whether Mrs. Hornbostel owes any reimbursement to the community, and whether Mrs. Hornbostel is entitled to damages against the other parties for frivolous appeal.

Interventions of Eppling and Valicenti
Messrs. Eppling, Moore and Valicenti intervened to assert claims against the community for loans made to Mr. Fouchi. They filed pleadings in proper person, alleging each had loaned Frank Fouchi $9,000 cash in 1972 to assist him in starting a nightclub, but only part of the loans had been repaid.
The trial judge dismissed these claims, stating in his reasons for judgment he found the claims to be "wholly without merit" because of the parties' conflicting testimony and because the interventions were not supported by corroborating evidence.
As mentioned above, apparently Mr. Moore died prior to the trial, and was unrepresented at the proceedings. No personal representative has appeared for him, nor has an appeal been made on his behalf. Accordingly, we need not discuss his claim.
Mr. Valicenti testified by deposition. In his testimony, he stated that between the time his intervention was filed and the time of trial, Mr. Fouchi had repaid the balance of the loan under an oral compromise as to the amount of interest. Mr. Fouchi claims reimbursement from the community as subrogee of Mr. Valicenti, in the amount of $9,200.
The trial judge's reasons for judgment not only set forth the basis for his determination, but also provide a good summary of the evidence. Accordingly, we incorporate them into our opinion:
"* * * The intervenors, Valicenti and Eppling, each testified to loans made in cash for which each received an I.O.U. in the amount of $9,000.00 from Frank Fouchi. These sums along with $9,000.00 from W.C. Moore were allegedly delivered by Frank Fouchi in cash to one Joe Caronna to be held by him for an investment to be made by Fouchi in a modern lounge and supper club to be run by Caronna. Testimony indicated that after the death of Caronna in 1972, notes were executed in January, 1973, on which payments of principal and interest were made. The original notes were made to Donald Cole, Leo Praetorius and J.L. Valicenti. In January, 1976, the original note was destroyed and a new note executed to each alleged creditor. Cole and Praetorius were allegedly acting as agents for Moore and Eppling.
"Payments on these notes were made until January, 1979, when the original notes were again allegedly destroyed and new notes issued.
"Again, in January of 1982, the previous original notes were destroyed and new notes issued.
"Copies of the 1973 and 1976 notes do not bear a signature. The 1979 notes were executed after termination of the community.
"Frank Fouchi produced detailed records prepared by himself of payments made on these notes. The intervenors did not even produce a personal record of receipt of payments. No corroborating evidence was introduced in support of any transfers of money between the parties. There was not introduced into evidence one cancelled check, nor bank record *510 of the intervenors to support disbursement of funds to Fouchi, nor account of Fouchi showing receipt of the funds. All parties denied any claim either for interest received or interest paid in preparing income tax returns.
"Although Frank Fouchi produced detailed ledgers from the beginning of his marriage showing payment of medical costs for the birth of his first child in 1958 and grocery checks for the same year, he denied having any written records of his transactions with Caronna or the intervenors except for the current promissory notes and copies of previous notes.
"Answers to interrogatories * * * indicate that intervenors received payments only in 1981 and to the extent of $275.00 to Eppling and $300.00 to Moore. Valicenti indicated that he no longer had records of payments from Fouchi, yet he testified in his deposition to a record of payments prepared by [Fouchi's attorney]. This represents a gross conflict in the testimony presented at trial and the payment schedules in connection with the testimony of Valicenti and Fouchi. Additionally there is a conflict between the sworn descriptive list of March 5, 1979 * * * showing payments in 1977 to Praetorius and Cole of $320.00 and to Valicenti of $310.00, whereas Fouchi's computations show payments of $400.00 to each party.
"Eppling's W-2 for 1973 * * * indicated his wages from Delgado to be slightly over $11,000.00 for that year. He testified to having other sources of income but failed to provide his I.R.S. returns or any bank records to support his even having sufficient funds to make this loan, although all documents were subpoenaed.
"Because of the conflicting testimony of the parties and the fact that the interventions have not been supported by corroborating evidence, this court finds the claims to be wholly without merit."
It is clear the trial judge's decision on the interventions was based solely on credibility determinations. It is well-established law that the credibility determinations of the trier of fact may not be reversed unless clearly wrong:
"When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts." Canter v. Koehring Company, 283 So.2d 716, 724 (La.1973).
We do not find the trial judge clearly wrong in his determinations. Mr. Fouchi would have us believe a total of $27,000 in cash changed hands, without the lenders keeping records of either the loans or the alleged repayments, and without Mr. Fouchian apparently careful record keeper obtaining any type of receipt from Caronna, to whom he allegedly entrusted the entire bundle of cash. The peculiarity of these alleged loan transactions would be a "red flag" to any court.
Mrs. Hornbostel denied any knowledge of these loans. Mr. Fouchi attempts to impeach her credibility by pointing out that she had admitted, in a prior hearing, that her allegations in her petition for separation were false insofar as they concerned certain specific charges of cruelty made against Mr. Fouchi. At the trial of the partition proceeding, under cross-examination, Mrs. Hornbostel again admitted that *511 these allegations were false, but asserted she was telling the truth in the partition proceeding. She testified that the only time she had lied was in her petition for separation, and that this had been done on the advice of the attorney who had represented her at that time.
Considering all this, we cannot say the trial judge committed manifest error in his credibility determinations. It is readily apparent from the lengthy record that the learned judge had presided at a number of other hearings at which Mr. Fouchi and Mrs. Hornbostel testified relative to their domestic disagreements. He was, thus, very familiar with the case, and with the people involved. We find no reason to substitute our judgment for his.

Intervention of Catherine Quaid
Catherine Quaid, who is Mr. Fouchi's mother, intervened to assert claims for loans she made to the Fouchis at various times during their marriage, evidenced by a series of promissory notes from Frank Fouchi. The notes ranged in date from December 1957 to June 1968, in amounts varying from $200 to $2,000. Her claim was supported by Mr. Fouchi, who also asserted a claim for reimbursement for interest paid by him on the notes. Mrs. Hornbostel, however, denied the money was intended as loans; she testified she had always understood the money given them by Mrs. Quaid had been intended as gifts. Mrs. Hornbostel also raised an exception of prescription to the notes.
To overcome the exception, Mr. Fouchi entered into evidence photocopies of a notebook belonging to Mrs. Quaid which listed the amounts of the notes and the interest payments he had allegedly made on them since 1969. Mr. Fouchi and Mrs. Quaid testified all these payments were in cash, and the only evidence they had of them was Mrs. Quaid's notations in her notebooks. He had no receipts from Mrs. Quaid. Both he and Mrs. Quaid testified they had not claimed the interest, either as a deduction or as income, on their income tax returns.
Mrs. Quaid was unable to produce cancelled checks to show the transfers for most of the loans; she testified she had withdrawn the money from her homestead accounts and endorsed the homestead checks directly over to Mr. Fouchi. Similarly, Mr. Fouchi was unable to establish deposits of funds in the Fouchi community checking accounts for most of the alleged loans.
In connection with a $1,300 loan in 1968, for which Mr. Fouchi produced a collateral pledge agreement by which he pledged some stock to Mrs. Quaid, the trial judge found there was no withdrawal of funds shown from Mrs. Quaid's account, nor any corresponding deposit of funds to the Fouchi account. The transactions were allegedly in cash.
Based on the above evidence, the trial judge held,
"Due to the aforesaid failure of consideration, lack of enhancement to the community and prescription, the claims of Catherine Quaid are denied as is any reimbursement due Frank Fouchi in connection with these claims."
This conclusion, like that on the other intervenors' claims, is based primarily on a credibility determination by the trial judge. Without interest payments, the notes unquestionably would have prescribed by 1982, when the trial was held. Apparently the judge disbelieved Mrs. Quaid and Mr. Fouchi and concluded no interest payments had actually been made. Considering the great discretion accorded the trier of fact, we cannot say he was unreasonable or clearly wrong in his determination.
As to the loan for which Mr. Fouchi allegedly pledged stock as security, there was no evidence to establish that he made actual delivery of the stock certificates to his mother. LSA-C.C. arts. 3152 and 3158 require that the creditor be put in possession of the pledged item for the pledge to be valid. A valid pledge will interrupt prescription on a note as long as the pledgee retains possession of the pledged item. Without evidence of possession by Mrs. *512 Quaid, the pledge cannot be upheld; accordingly, the January 15, 1968 note must be held to be prescribed also.

Fair Market Value of the Family Home
The trial judge found the fair market value of the family home to be $55,000 as of the date of trial, January 7, 1982. Mr. Fouchi seeks to have this valuation reduced to $45,000, with an allowance of $7,600 for repairs "necessary to make the place marketable."
Both Mr. Fouchi and Mrs. Hornbostel presented testimony of expert appraisers at trial. The notary and appraisers appointed by the court to inventory the community had placed the value of the house at $55,000 on February 18, 1980. Previous appraisals of the house in 1978 had placed the value at between $45,000 and $46,000. At trial, Mr. Fouchi's appraiser testified he had appraised the property on November 23, 1981, at which time he placed the value at $45,000, and estimated it would require $7,600 to put the house in marketable condition. Mrs. Hornbostel's appraiser placed the value as of November 10, 1981 at $65,000. Each submitted a written appraisal in support of his opinion.
Mr. Fouchi argues his appraiser had the best qualifications, and accordingly that the trial judge erred in not accepting his appraiser's estimate of the value.
The trial judge stated, in his reasons for judgment,
"Sufficient comparables were shown by both parties to indicate that the property is worth more today than it was in 1978. A conservative appreciation factor of eight percent (8%) per annum on the $45,000.00 value agreed by both parties in 1978 would place the property at approximately the figure set forth by the notary and appraisers in the inventory. Since the true market value can only be ascertained by placing the property on the market, the value previously set by the notary and appraisers is accepted by this court."
The trial judge is granted considerable discretion in the acceptance or rejection of expert testimony. Ford v. Dixie Buick, Inc., 400 So.2d 228 (La.App. 4th Cir.1981). We find no abuse of discretion by the trial judge in the valuation thus placed on the property.

Liability for Silver Items
Mrs. Hornbostel testified the silverware in question had been acquired early in their marriage. The pattern had been discontinued, and so their collection stopped at six place settings plus some serving pieces. She said it was seldom used, and did not testify precisely when she last saw it, but did state it was in the house when she moved out.
Both Mr. Fouchi and Mrs. Quaid testified there was no silver in the house when they took an inventory after legal proceedings for separation had begun. Mrs. Quaid testified she had never seen such items in the house, while Mr. Fouchi said he had not seen the silverware for a long time, and was not sure where his wife stored it. He attempted to establish, by implication, that the silver may have been stolen by friends of his children who visited the house when Mrs. Hornbostel was living there, after the Fouchis had physically separated.
In his reasons for judgment, the trial judge stated,
"The Court finds that the silver service was in the Fouchi home at the time the premises was vacated by Sheila Fouchi Hornbostel. As this item was in the control of Frank Fouchi since that time, he shall be held accountable for its disappearance. McElwee v. McElwee, 255 So.2d 883 (La.App. 2d Cir.Ct.).
"Accordingly, the silver service shall be placed on the inventory of movables at 4620 Tartan Drive, valued at $4,100.00." [We note the value assigned the silver in the reasons for judgment is incorrect. The value assigned the silver in the judgment itself is $4,523.00, which is the value established at trial.]
This, too, is a matter turning on the credibility of the witnesses. The trial judge had the witnesses before him, and *513 could observe their demeanor while they testified; we have only a written transcript. With no other evidence beyond the above-mentioned testimony, we cannot say the trial judge's evaluation of the witnesses' credibility was unreasonable, and there is nothing to establish he was clearly wrong. Accordingly, his finding that Mr. Fouchi was accountable for the disappearance of the silver is affirmed.

Reimbursement of the Community by Mrs. Hornbostel
At issue is the amount of $4,325, which Mr. Fouchi claims Mrs. Fouchi "siphoned" from community accounts and deposited in an account in her name in California. Testimony by William Fry, Mrs. Hornbostel's father, established her family had sent her checks totalling $4,100 as gifts in the late 1960's. Mr. Fry stated Mrs. Hornbostel later returned $2,500 to him to invest for her, but that eventually this money was all returned to her gradually as she needed funds. He also testified to an additional $400 which she sent to be deposited in her savings account in California. He did not know what happened to this, as Mrs. Hornbostel kept the records on it.
Mrs. Hornbostel testified the $4,100 initially had been deposited in a Louisiana checking account in her name, and she had returned $2,500 to her father to invest for her. The rest, she said, "was in the community somewhere," and had probably been used for family expenses. The $2,500 she had returned to her father she later withdrew for living expenses.
Mr. Fouchi testified that to his knowledge at least $3,000 of the money received from Sheila's family was expended on the community. The effective date of the dissolution of this marital community is March 4, 1977, the date on which the petition for separation was filed (because the judgment of separation is retroactive to the date the petition is filed). Accordingly, it is governed by the pre-1980 community property laws.
Under the old law, to obtain restitution of her separate funds, a wife needed only to show they were delivered to the community for its use. Slater v. Culpepper, 233 La. 1071, 99 So.2d 348 (1957). Where the wife fails to meet that burden, her claim must be denied. Reynolds v. Reynolds, 388 So.2d 1135 (La.1980), on rehearing.
Although both Mr. Fouchi and Mrs. Hornbostel had requested reimbursement in the district court, the trial judge denied their requests, stating he believed that the loans or gifts by the parents were donations to the community rather than to the parties individually, and that the parties had not overcome the strong presumption that property acquired during the existence of the community was community property. We find no manifest error in that ruling.
However, the trial judge did not discuss whether Mrs. Hornbostel owed the community reimbursement for the monies deposited in her California bank account, and invested by her father on her behalf. Such a silence is to be construed as a denial of that claim.
Considering the testimony, it is clear that most if not all of the money was spent for community purposes. Even that money in the California accounts was ultimately returned to Mrs. Hornbostel, who testified she spent it for family expenses. Mr. Fouchi himself stated at least $3,000 had been spent on community expenditures. Absent proof that any amount in excess of $3,000 is still in Mrs. Hornbostel's possession or, alternatively, that it was not spent for community purposes, as she said it was, she is not liable to reimburse the community.

Mrs. Hornbostel's Claim for Damages for Frivolous Appeal
Having disposed of the issues raised by the intervenors and Mr. Fouchi, we turn to the single issue raised by Mrs. Hornbostel's answer to the appeal. She claims damages for frivolous appeal, asserting,

*514 "The entire case regarding all interventions has resembled one grand charade. To carry this charade to the Appellate Court without any evidence other than testimony of the parties, prescribed notes and reams of documents created and prepared by appellant and intervenors in anticipation of this trial is clearly an abuse of the judicial process. * * *"
Damages for frivolous appeal are awarded under LSA-C.C.P. art. 2164 only when it clearly appears that the appeal was taken solely for the purpose of delay or that counsel for the appellant does not seriously believe in his legal position. Mathews v. Mathews, 415 So.2d 234 (La.App.2d Cir.1982). We are not convinced these appeals fall into either of these categories, and therefore we reject the demand for damages for frivolous appeal.
Finally, we note that Mrs. Hornbostel's brief raises several issues we do not discuss because she did not appeal and did not assert these claims in her answer to the other parties' appeals. LSA-C.C.P. art. 2133 states, "The answer filed by the appellee shall be equivalent to an appeal on his part from any portion of the judgment rendered against him in favor of the appellant and of which he complains in his answer." (Emphasis added.)

Conclusion
Considering the foregoing, the judgment of the district court is affirmed.
AFFIRMED.