DAVID JOSEPH MAIN

VERSUS

DENA BACH MAIN

NO. 19-CA-503

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 708-949, DIVISION "L"
HONORABLE DONALD A. ROWAN, JR., JUDGE PRESIDING

February 19, 2020

**FREDERICKA HOMBERG WICKER
JUDGE**

Panel composed of Judges Fredericka Homberg Wicker,
Jude G. Gravois, and Robert A. Chaisson

**<u>REVERSED AND REMANDED</u>**
    **FHW**
    **JGG**
    **RAC**

COUNSEL FOR PLAINTIFF/APPELLANT,
DAVID JOSEPH MAIN
Scott C. Stansbury
Bernard A. Dupuy
Bennett Wolff

COUNSEL FOR DEFENDANT/APPELLEE,
DENA BACH MAIN
Leslie A. Bonin

**WICKER, J.**

Appellant, David Joseph Main, seeks this Court's review of the trial court's denial of his Second Petition for Visitation, seeking supervised visitation with his minor child, K.E.M., finding that supervised visitation is not in the best interest of the child.[1] We reverse the judgment of the trial court and order reunification therapy for David Main and K.E.M., as well as therapeutically supervised visitation between David Main and K.E.M. in accordance with the March 15, 2018 recommendations of the Hearing Officer. Further, we order both David Main and Appellee, Dena Bach Main Waters, to attend and complete a program designed to educate and inform the parties of the needs of the children under La. R.S. 9:331.2, and direct the trial court to appoint a parenting coordinator pursuant to La. R.S. 9:358.1 to assist the parties in implementing a parenting plan. Further, having found both the proceedings before the trial court and this Court to have merit, we deny Dena Bach Main Waters' motion for sanctions, attorney's fees and costs, and damages. This case is remanded to the trial court to implement reunification therapy, therapeutic supervised visitation, parenting education, and the appointment of a parenting coordinator.

## FACTS AND PROCEDURAL HISTORY

Appellant, David Joseph Main ("Father") and Appellee, Dena Bach Main ("Mother") were married on January 27, 1995; three children were born during the marriage (two sons, D.M. and S.M., and a daughter, K.E.M). Father and Mother separated on November 2, 2011 and filed for divorce on December 1, 2011. On January 19, 2012, Hearing Officer Paul Weidig recommended joint custody with Father having visitation every other weekend. After concerns about "recent

---

[1] The initials of the children of the parties will be used to protect and maintain the privacy of the minor child involved in this proceeding. Uniform Rules, Courts of Appeal, Rule 5-1 and 5-2.

behaviors of the children," the hearing officer recommended alternating weeks of custody on June 1, 2012.

On November 14, 2012, Mother filed a motion to appoint an evaluator for psychological evaluation of all the parties, citing concerns about Father's history of substance abuse and "erratic, alarming, abusive, and threatening behavior." In the early morning hours of January 1, 2013, Father threatened his oldest son D.M. with a gun in front of the child's siblings while attempting to return him to Mother's house after a disagreement.[2] On January 24, 2013, Mother filed an amended rule for contempt regarding the incident and sought a restraining order.[3] Sometime in January of 2013, S.M. disclosed to his therapist that his father had shared drugs with him and taken him to a strip club in Paris in 2012 where he had obtained the services of a prostitute.[4] On January 31, 2013, the parties entered into a consent judgment granting sole care, custody, and control of the three children to Mother on an interim basis, with Father being restrained from contact with Mother and children while he addressed a "heath issue." On February 5, 2013, Father began inpatient treatment at Woodlake Addiction Recovery Center.

The divorce was finalized on February 22, 2013. Father completed inpatient treatment on April 16, 2013.[5] Despite the restraining order in the consent judgment, Father texted his children on March 7, 2013, June 11-24, 2013, and July 10-28, 2013.[6] On May 13, 2013, Father filed a motion to modify custody which

---

[2] Father testified in his deposition that D.M. had thrown a party at his home while he was not present, became intoxicated, and attacked S.M. He claimed that when D.M. tried to attack him at Mother's house, he made an "idle threat" without a gun.

[3] Mother had previously filed a rule for contempt on December 7, 2012 claiming that Father interfered with her custody, spoke negatively about her to the children, engaged in a pattern of harassment, and failed to timely pay support.

[4] S.M. was seeing a therapist after his psychiatric evaluation in October of 2012. In August of 2012, when S.M. was fourteen years old, he accompanied his father on a business trip to France and Amsterdam. Father also admitted to S.M.'s assisting him in obtaining painkillers, in exchange for being allowed to smoke marijuana.

[5] Father's discharge instructions were to continue with Alcoholics Anonymous (AA). He also lived in a sober living facility in Baton Rouge for six months on the weeks that he was not working as a riverboat pilot.

[6] S.M.'s therapist recommended that contact with Father was inadvisable due to his anxiety over receiving text messages from Father.

was dismissed after the parties entered a partial consent judgment on October 28, 2013.[7]

Father filed a motion to appoint a parenting coordinator on May 30, 2014. This motion was reset on July 1, 2014.[8] On October 13, 2014, Mother's attorney took Father's deposition where he admitted to a "mental relapse" in June of 2010 and "straight out relapse" in October of 2012, abusing painkillers after his knee surgery.[9] He disclosed an addiction to Klonopin, prescribed to him in October 2011 for anxiety due to the divorce, which led him to seek treatment.[10] Father also admitted to paying for drinks at a club in Paris with S.M. in 2012, spending almost $2,000.[11] Father stated he was wrong for his actions in front of his children, including speaking badly of Mother and blaming her and her infidelity for the divorce.

On November 14, 2014, the court appointed Steven Thompson, Ed.D., to conduct a custody evaluation. As part of the custody evaluation, Mother and Father met with Dr. Brian Murphy, a clinical psychologist, for psychological testing in November of 2014. On March 16, 2015, Father and D.M. met with Dr. Thompson for a session described as "explosive and abusive" by Mother, after which Father decided not to proceed with evaluation. The parties entered a consent judgment on April 15, 2015 lifting the injunction prohibiting contact between Father and his sons, S.M. and D.M. (who was no longer a minor), giving

---

[7] Mother opposed this motion as premature since no custody evaluation had been completed. On August 6, 2013, Father filed a motion to appoint an evaluator, and the hearing officer recommended the appointment of Dr. Rafael Salcedo.

[8] S.M. was admitted for treatment at New Beginnings rehabilitation treatment facility in Opelousas. Father alleged that Mother failed to keep him informed of the welfare of the children. Paternal grandmother filed a petition for grandparent visitation on June 25, 2014 which was ultimately dismissed on February 2, 2015 for failing to allege facts showing Mother's unfitness to justify grandparent visitation.

[9] Father also admitted to previous treatment for opiate addiction at Palmetto in October of 2002, after which he was sober until a relapse in July 2011 with synthetic marijuana.

[10] Father stated that Klonopin lowered his inhibitions and "opened the door for other things to show up."

[11] Father denied getting S.M. a hooker, giving him money to buy drugs, giving S.M. marijuana, or smoking marijuana with S.M. He did acknowledge charges on his credit card at clubs "Le Love" and "Pussy World."

sole custody of S.M. to Father, but maintaining the injunction prohibiting contact with K.E.M. "pending Dr. Thompson's recommendations."[12]

On October 9, 2015, Father filed a motion for supervised visitation with K.E.M., requesting the re-establishment of their relationship with the assistance of a mental health professional. This motion was denied on March 10, 2016, because the provision of the consent judgment regarding Dr. Thompson's recommendations had not yet been met. On November 2, 2016, Father filed a motion to compel completion of the custody evaluation report.

On January 2, 2017, Dr. Thompson filed his custody evaluation report recommending that the trial court grant custody of K.E.M. to Mother and avoid an order of visitation with Father, leaving the choice to K.E.M. Dr. Thompson's report contained synopses of his interviews with Mother, Father, Julie Ruel (Father's counselor), D.M., K.E.M, and Dr. Brian Murphy. K.E.M. reported that she did not miss her father and "felt better" living in the home without Father. She did not want to see Father. Dr. Murphy recommended visitation because the "reward" of the importance of the father/child relationship to a child's formation was worth the "risk" of Father's history of poor judgment. Dr. Murphy opined that Father benefitted from his past mistakes and had a relatively low relapse potential.[13] Dr. Thompson found "while David Main appears to have made progress in addressing his issues of substance abuse and violence toward his children and their mother, unfortunately he has not reached the point of appreciating the magnitude of his destructive contribution to the family." He concluded that Father had shown marginal progress in therapy to "develop

---

[12] Father was first given interim sole custody of S.M. in a consent judgment of February 2, 2015 after Father filed a motion for emergency status conference after S.M. was arrested by Harahan Police Department for trying to sell OxyContin.

[13] After psychological testing, Dr. Murphy diagnosed Father with polysubstance and alcohol dependency.

behaviors that would redefine himself and relationships," and he advised avoiding implementation of visitation with K.E.M.

Father filed a motion for a second opinion evaluation on January 10, 2017, requesting an independent medical evaluation. On March 6, 2017, Father filed a motion to disqualify the custody evaluator and strike the custody evaluation report based on it not containing a recent evaluation of the parties, Dr. Thompson's violation of licensed professional guidelines for conducting child custody evaluations, and the report's factual inaccuracies.[14] The hearing officer recommended an independent custody evaluation by an evaluator of his choice, providing for an objection hearing if the mother and child were required to attend any evaluation sessions. Mother objected based on Father not alleging any material change so as to warrant modification to the current visitation schedule or providing good cause for a second opinion evaluation. On May 4, 2017, the trial court granted Mother's objection to the Hearing Officer's recommendation granting the motion for a second evaluation.[15]

On September 6, 2017, Father filed his Second Motion for Visitation.[16] On January 5, 2018, S.M. died of a drug overdose.[17] After a hearing on March 8, 2018, the Hearing Officer recommended supervised visitation with K.E.M. on Sundays from 2:00 to 3:00 P.M. for Father, conditioned on a drug test and the results of the hearing on Mother's exception of vagueness. Father tested positive for benzodiazepines on March 16, 2018.[18] Mother's exception of vagueness was sustained by the commissioner on April 11, 2018, and Father was given fifteen

---

[14] Father's motion failed to raise sufficient grounds to support his allegation and, notably, did not contain Dr. Thompson's written report.

[15] Father sought supervisory review of the denial of his request to appoint a second custody evaluator, which was denied by this Court. *Main v. Main*, 17-C-286 (La. App. 5 Cir. 6/27/17). The panel found that there was no showing that circumstances had developed since the evaluation to necessitate another evaluation.

[16] Mother filed exceptions of res judicata, prematurity, and no cause of action. Father filed an amended motion for visitation on December 13, 2017.

[17] The cause of death is not clear from the record, but allegations of the parties indicate a heroin overdose with the presence of benzodiazepines in S.M.'s body.

[18] Father admitted at trial to being prescribed valium after S.M.'s death.

days to amend his motion. At the August 23, 2018 hearing before the trial court on Mother's exception of no cause of action, the trial court found "this case has been mired in procedural matters, and it is the opinion of this Court that it is ripe for an evidentiary hearing to determine the substantive merits of whether Mr. Main is entitled to visitation with his minor daughter."[19]

A contested hearing was held on June 20, 2019. Father presented testimony from his counselor, psychiatrist, Alcoholics Anonymous sponsor, and Dr. Murphy. He also testified on his own behalf. Mother presented testimony from S.M.'s psychologist and Dr. Thompson. On June 24, 2019, the trial court denied Father's Motion for Visitation, finding it would not be in the minor child's best interest to order supervised visitation or reunification therapy at this juncture in her development. Father filed a timely appeal. Mother filed a response to the appeal requesting a review of the trial court's denial of her motion for sanctions, attorney's fees, and costs.

## DISCUSSION

Father asserts five assignments of error in the trial court's denial of his motion for supervised visitation. Father claims that the trial court erred in denying his request because Mother failed to show that visitation was not in the child's best interest. He further asserts that the trial court impermissibly terminated his parental rights. Additionally, Father alleges that the trial court erred in denying his motion to disqualify Dr. Stephen Thompson. Father alleges the trial court erred in allowing the testimony and evidence regarding incidents related to the child, S.M., which occurred before the consent judgment was entered in January 31, 2013, that he argues are irrelevant and highly prejudicial.

---

[19] On July 26, 2018, Commissioner Bailey denied Mother's exception of no cause of action after a hearing, stating "you all need to get this thing tried. Okay? He's stated a cause of action, he's shown a change in circumstances."

*Standard of Review*

It is well-established that each child custody case must be viewed in light of its own particular set of facts and circumstances, with the paramount goal of reaching a decision that is in the best interest of the child. *McFall v. Armstrong*, 10-1041 (La. App. 5 Cir. 9/13/11), 75 So.3d 30, 38. Great weight is given to the trial court's determination in matters of visitation, and the court's judgment will not be overturned unless a clear abuse of discretion is shown. *Zatzkis v. Zatzkis*, 632 So.2d 307, 320 (La. App. 4 Cir. 1993), *writ denied*, 94-0157 (La. 6/24/94), 640 So.2d 1340, *and writ denied*, 94-0993 (La. 6/24/94), 640 So.2d 1341. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. *Leaf v. Leaf*, 05-592 (La. App. 4 Cir. 11/8/06), 929 So.2d 131, 132. An appellate court may not reverse reasonable findings merely because it would have weighed the evidence differently, but an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. *Silbernagel v. Silbernagel*, 06-879 (La. App. 5 Cir. 4/11/07), 958 So.2d 13, 17. Where the trial court does not provide written reasons for his judgment, reveal the factors in the home study it relied upon to come to its conclusion, mention whether it considered any of the factors listed in La. C.C. art. 134, or state how the testimony and home study related to the best interest of the child, an appellate court may not give the trial court's decision the usual deference required by a manifest error standard. *Bergeron v. Clark*, 02-493 (La. App. 3 Cir. 10/16/02), 832 So.2d 327, 330, *writ denied*, 03-0134 (La. 1/29/03), 836 So.2d 54.

*Burden of Proof*

Throughout the proceedings in this case, both parties assert that the other bore the burden of proving whether or not visitation is in the best interest of the child. To modify a custody arrangement where the original custody decree is a stipulated judgment, the party seeking to modify need only prove a change in circumstances since the original decree and prove that the new custody arrangement would be in the best interest of the child. *Aucoin v. Aucoin*, 02-756 (La. App. 3 Cir. 12/30/02), 834 So.2d 1245, 1248; *Evans v. Lungrin*, 97-0541, 97-0577 (La. 2/6/98), 708 So.2d 731, 738.[20] As a change in visitation is not as significant as a change in actual physical custody, a showing that the change is in the best interest of the child is sufficient. *Dufresne v. Dufresne*, 08-215 (La. App. 5 Cir. 9/16/18) 992 So.2d 579, 586-7; *White v. Fetzer*, 97-1266 (La. App. 3 Cir. 3/6/98), 707 So.2d 1377, 1380.[21] The question of visitation is always open to change when the conditions warrant it. *Reynier v. Reynier*, 545 So.2d 663, 664 (La. App. 5 Cir. 1989).

In this case, Father is not seeking to modify or change the consent judgment, but rather to enforce the terms of the judgment regarding visitation. The parties agreed to a consent judgment on January 31, 2013 granting Mother's sole custody of K.E.M, on an interim basis, with Father being "restrained, enjoined, and prohibited from having any contact" with K.E.M. "pending evaluations in this matter agreed to by the parties and/or ordered by the court." As the judgment was

---

[20] When a trial court has made a considered decree of permanent custody, the party seeking a change bears a heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child. *Bergeron v. Bergeron*, 492 So.2d 1193, 1200 (La. 1986). There must also be a showing of a change in circumstances materially affecting the welfare of the child. *Id.* at 1194. The heavy burden of *Bergeron* will not be implicated when there was no prior ruling of custody by the trial court after an examination of evidence of parental fitness. *Evans v. Lungrin*, 97-0541 (La. 2/6/98), 708 So.2d 731, 738.

[21] Nonetheless, Father clearly demonstrated a change in circumstances since the original consent judgment by his completion of a residential treatment program for addiction, as well as a change in circumstances since the first evaluation by Dr. Thompson due to his continued treatment with a therapist and psychiatrist and continued participation in Alcoholics Anonymous.

by consent, the trial court never made a finding on Father's parental fitness, nor deemed that restricting his visitation to any of his children was warranted. On April 15, 2015, a consent judgment was entered whereby parties agreed that the contact restrictions "shall remain in place pending the recommendations(s) of the court appointed evaluator, Dr. Stephen Thompson, or further agreement" of the parties. As the evaluation was complete and filed with the court on January 2, 2017, the April 15, 2015 consent judgment prohibiting contact "pending Dr. Thompson's recommendations" had been satisfied, requiring court action to re-impose any further contact restriction.

If as a result of the evaluator's recommendations Mother is seeking to deny visitation, she bears the burden of proving that visitation would not be in the child's best interest. *Percle v. Noll*, 93-1272 (La. App. 1 Cir. 3/11/94), 634 So.2d 498; *Maxwell v. LeBlanc*, 434 So.2d 375 (La. 1983). La C.C. art. 136 provides that "Subject to R.S. 9:341 and 364, a parent not granted custody or joint custody of a child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would not be in the best interest of the child." This section restates the test for parental visitation established in the leading case of *Maxwell v. LeBlanc*; La. C.C. art. 136, Revision Comment (b). In that case, the Louisiana Supreme Court recognized the right of visitation for a non-custodial parent as a natural right, enforceable in a civil action when the custodial parent denies visitation access. *Maxwell v. LeBlanc*, 434 So.2d at 376. The Supreme Court stated "a parent is entitled to reasonable visitation rights unless it is proved conclusively that visitation would endanger seriously the child's physical, mental, moral, or emotional health." *Id*. at 379.[22] A presumption operates in favor of visitation that can be overcome only by "conclusive evidence that the parent has

---

[22] "Only in extreme circumstances should the trial court find that a permanent deprivation of visitation rights has been proven." *Id.* at 379 FN2.

forfeited his right of access by his conduct or that exercise of the right would injuriously affect the child's welfare." *Id.* Given the weighty matters at stake, the "extreme measure" of barring visitation rights to a parent should not be maintained absent clear evidence that lifting such bar would be harmful. *Kaptein v. Kaptein*, 16-1249 (La. App. 4 Cir. 6/14/17), 221 So.3d 231, 238; *Becnel v. Becnel*, 98-593 (La. App. 5 Cir. 3/25/99), 732 So.2d 589, 595, *writ denied*, 99-1165 (La. 6/4/99), 744 So.2d 630.

Mother argues that there is a history of abuse by Father, specifically against D.M. and S.M., which shifts the burden to Father and limits his rights to his visitation. She argues this history should trigger a presumption in her favor, placing the burden on Father to prove visitation would be in K.E.M.'s best interest. The trial court, however, never made a finding which would implicate La. R.S. 9:341 and 9:364.[23] The trial court did not state that this was a case involving family violence or domestic abuse such that La. C.C. art. 136's normal standard should be deviated from, nor did it even discuss what predicate findings would trigger those statutes' restrictions on visitation. Even for visitation with an abusive parent, supervised visitation is allowed, with the restriction being removed if the parent proves at a contradictory hearing that he or she has successfully completed a court-monitored domestic abuse intervention program.[24] While La. R.S. 9:341(B) allows the court to prohibit "all visitation and contact between the abusive parent

---

[23] La. R.S. 9:364 establishes a presumption that custody shall not be awarded to parents who subject their children to violence and abuse, with only supervised visitation allowed for parents with a history of perpetrating family violence and a prohibition on all visitation for parents who sexually abused their child. Under La. R.S. 9:341, "a court shall order visitation only if the abusive parent proves by a preponderance of the evidence that visitation would be in the best interest of the child. . .and would not cause physical, emotional, or psychological damage to the child." The context of the statute seems to interpret "visitation" as unsupervised visitation. That statute, however, applies to visitation with the abusive parent and abused child/children, after a court has found that a parent has subjected any of his children to family violence or domestic abuse. The court may only find a history of committing family violence if the court finds that one incident of family violence has resulted in serious bodily injury or the court finds more than one incident of family violence.

[24] At the hearing, the court will "consider evidence of the parent's current mental health condition and the possibility the abusive parent will again subject his children. . .to family violence or domestic abuse, or willingly permit such abuse to any of his or her children." La. R.S. 9:341.

and the children," this may occur only after a finding by clear and convincing evidence that a parent has subjected any of his or her children to sexual abuse or has willingly permitted such abuse to any of his or her children. Thus, Mother carried the burden at the hearing of proving that visitation would not be in the best interest of the child under La C.C. art. 136.

*Evidence from the Hearing*

At the time of the 2019 hearing, K.E.M., who was born on March 19, 2004, was fifteen years old and a sophomore at St. Martin's high school. During the hearing, the court heard testimony from Licensed Professional Counselor Julie Ruel, Father's individual counselor for the past four years. She testified that he is committed to treatment, devoted to improvement, made an effort to heal from trauma, sought information on how to better parent adult children, and implemented techniques to respond to depression and anxiety. While she did not recommend unsupervised visitation at this time, she testified she felt confident in making a recommendation for supervised contact. Ms. Ruel recommended therapeutic intervention for Father's reunification to assist K.E.M. with questions she may have, regarding why Father has not had custody, despite not being ready for the explanations.

As to Father's ability to parent, Ms. Ruel testified that Father discusses his daughter fairly often and that she has prepared him for how to deal with reuniting and interacting with her in a way that will not harm her. Father has expressed concern with how to respond to K.E.M. in such a way that allows her to receive healthy answers from him in a developmentally appropriate way. Ms. Ruel stated that Father demonstrates a working knowledge of how to interact with his daughter on an emotional level.

Father's psychiatrist, Dr. Charles Chester, testified regarding his treatment of Father for depression in 2018 following S.M.'s death. He believes Father has a

"mild case of Bipolar 2." He pointed out that Father has been scrupulous and conscientious regarding prescription drug use, including the use of Valium and Ativan to help with fear of flying. Father's Alcoholics Anonymous sponsor testified that Father completed his "steps" in 18 to 20 months and attends two to three AA meetings weekly.

Clinical psychologist, Dr. Brian Murphy, testified as an expert witness regarding his evaluation of Father after personality testing, a review of his history and symptoms, and an interview with Father in 2014. He believed Father had acknowledged and expressed extreme remorse and guilt. He found Father to have a low risk for relapse. Dr. Murphy's opinion as to whether Father should be given access to his children was that the risk for future transgressions was worth the reward of the relationship to the children's formation.

Father testified that he entered the initial consent judgment because at the time he was "out of control," and Mother's attorney had threatened to file a document that endangered his employment. Father believed the judgment would be temporary and that when he came out of treatment, he would reestablish his relationships with his children. Father testified that he had last consumed alcohol on February 5, 2013 and has abstained from the use of marijuana or Klonopin since receiving treatment. He was prescribed Valium by his family practitioner after S.M.'s death, but despite the stress of the last few years, he has not used alcohol or abused drugs.

Father stated that Dr. Thompson never met with him and K.E.M. together to witness their interactions. Father testified that he continued to pay child support for K.E.M. He acknowledged "past untruths" in his deposition or requests for admission. Father testified that he is a different person from the one who made the horrible parenting decisions with S.M.

The Court also heard evidence presented by Mother. Dr. Morgan Feibelman testified that S.M. suffered from post-traumatic stress disorder, nightmares, flashbacks, and hyperarousal symptoms. Dr. Feibelman was concerned about Father's contact with S.M. This concern stemmed from S.M.'s professed fear of his father once he disclosed that Father had purchased oral sex for him from a prostitute in 2012 and would give him marijuana in exchange for help in procuring painkillers.

Dr. Stephen Thompson testified pursuant to his appointment as a custody evaluator. He is a Licensed Professional Counselor and Custody Evaluator with a Doctorate in Education. He testified to performing thirty custody evaluations since 1988. He has been previously qualified as an expert in several courts. His opinion, unchanged since he formed it in 2017, was that there should not be contact between Father and K.E.M. unless the court found Father had shown significant change and sufficient progress in terms of his treatment. He acknowledged that he had received positive feedback from Ms. Ruel on Father's progress and stated that "Mr. Main, apparently, has done remarkable work."

Dr. Thompson opined that the Court should not get involved and leave the decision to K.E.M. He believes that as an evaluator, his goal is to reduce conflict and figure out how to establish normalcy for the family and child. He testified that K.E.M. did not want contact as she was fearful of Father due to reports of domestic conflict and her memories of Father threatening to shoot D.M. When asked if it was in K.E.M.'s best interest to have contact with Father, Dr. Thompson stated "K.E.M. needs to have a relationship with her father. What is more difficult now is figuring out how to pull that off." He opined that "whatever is done needs to be more creative than what it was four or five years ago because we're dealing with an aspiring adult here." Dr. Thompson believed that adolescents start to move away from parents, and he has not seen successful reunifications at that

developmental stage "unless there was full participation and support on the part of the child and the parent."

While Dr. Thompson had spoken to the child for a brief interview the week before the hearing, the trial court declined to allow testimony relating to that interview to be introduced, pursuant to Father's objection that the court did not approve that evaluation. Dr. Thompson stated that he could not be sure that the child would be well taken care of and that her needs would be met. He also testified "I'm not hearing anywhere in this proceeding that there is a desire for reunification on both sides." Dr. Thompson testified "it's for the court to assess whether father has exhibited sufficient shame for his behavior to have visitation."

## ANALYSIS

After reviewing the evidence from the hearing, as we find no reasonable basis at this point in time for the trial court's June 24, 2019 judgment, we find that the trial court abused its discretion in its judgment denying supervised visitation with therapeutic intervention. There is no evidence in the record to support a finding that therapeutically supervised visitation with her father, while he actively participates in treatment, is not in K.E.M.'s best interest. The trial court did not hear clear and convincing evidence that harm would result to the child from visitation supervised by treatment providers. There was no discussion by the trial court of the La. C.C. art. 134 factors in making a best interest determination for child custody.[25] *Schouest v. Schouest*, 06-972 (La. App. 5 Cir. 5/29/07), 960 So.2d 285, 287.

---

[25] The best interest factors set forth in La. C.C. art. 134 include: (1) The potential for the child to be abused, as defined by Children's Code Article 603, which shall be the primary consideration. (2) The love, affection, and other emotional ties between each party and the child. (3) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child. (4) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs. (5) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment. (6) The permanence, as a family unit, of the existing or proposed custodial home or homes. (7) The moral fitness of each party, insofar as it affects the welfare of the child. (8) The history of substance abuse, violence, or criminal activity of any party. (9) The mental and physical health of each party. Evidence that an abused parent suffers from the effects of past abuse by the other parent shall not be grounds for denying that parent custody. (10) The home, school, and

*Best Interest Factors*

The La. C.C. art. 134 factors for child custody should also be used to guide the trial court in deciding whether to deny or limit visitation. *Maxwell v. LeBlanc*, 434 So.2d at 378. The court is to apply these factors, not mechanically, but with the totality of the facts and circumstances in its analysis of the best interest of the child, and the Louisiana Supreme Court advises that correct application of the "best interest" standard requires "a real cognizance of the widely accepted view that it is generally in the child's best interest to have continued contact with noncustodial parents." *Id.* at 379.[26] While many of these factors are not pertinent to a determination of whether visitation is in the best interest of a child,[27] the trial court failed to reference which factors it relied upon in making its decision to deny supervised visitation to Father.

A review of the record reveals there are many factors which favor supervised visitation in this case. Father has provided for K.E.M.'s material needs through substantial child support payments, currently paying $6,000 a month, 100% of her private school tuition, and 100% of "special expenses." (factor 4). He previously cared for and reared K.E.M. with Mother before the separation and divorce (factor 14). Due to his years of experience in counseling and treatment, it appears he is capable of giving K.E.M. love, affection, and spiritual guidance (factor 3). The history of litigation in this case reveals that Mother has not been

---

community history of the child. (11) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference. (12) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party, except when objectively substantial evidence of specific abusive, reckless, or illegal conduct has caused one party to have reasonable concerns for the child's safety or well-being while in the care of the other party. (13) The distance between the respective residences of the parties. (14) The responsibility for the care and rearing of the child previously exercised by each party.

[26] In its analysis of *Maxwell*, the Louisiana Supreme Court cited to cases from other states and journal articles in the fields of psychiatry and child psychology supporting the importance of a relationship with noncustodial parents, including Watson, *The Children of Armageddon: Problems of Custody Following Divorce*, 21 Syracuse L.Rev. 55, 85 (1969) ("No matter what type of parents the child has, sooner or later he must see them in accurate perspective and eliminate whatever fantasies he may have had about them. This ... can only come about through continued and intensive contact").

[27] (5) continuity of stable living environment, (6) permanence of custodial home, (10) historical home of child, and (13) distance between parties' residences.

willing and able to facilitate and encourage a close and continuing relationship

between the child and Father (factor 12).[28]

While several of these factors could weigh against Father being awarded

custody [i.e. (7) moral fitness, (8) substance abuse history, and (9) mental health],

these factors are not germane to a denial of supervised visitation. In examining the

jurisprudence relating to parents with a history of irresponsible decisions due to

substance abuse, Louisiana courts have placed restrictions on visitation to protect

children without preventing parents from exercising their right to visitation or

depriving children of a relationship with a parent. In considering addiction and

personality disorders, courts have ordered supervised visitation when the child

would be unable to protect herself in the parent's custody.[29]

In reviewing Dr. Thompson's report, his recommendation relied on the

reasonable preference of the child; however, the trial court did not hear any

evidence from the child directly (factor 11). Dr. Thompson failed to provide

---

[28] Nonetheless, objective evidence of specific abusive, reckless, or illegal conduct have caused her to have reasonable concerns for the child's safety or well-being while in Father's care.

[29] *See Coleman v. Coleman*, 47,080 (La. App. 2 Cir. 2/29/12) 87 So.3d 246, 254 (Court ordered supervised visitation only until the child reached the age of 10 when the father had a thirty-year history of alcohol and drug abuse, with eight convictions for DWI, and personality disorders); *Guidry v. Guidry*, 18-639 (La. App. 5 Cir. 5/22/19), 174 So.3d 709 (After the mother failed to show consecutive months of negative drug screening reports the court ordered her visitation to be supervised and set for review); *Bandy v. Bandy*, 07-849 (La. App. 3rd Cir. 12/5/07) 971 So.2d 456, 464 (The court ordered supervised visitation for a father who returned to drug use, taking his eleven-year-old son with him to procure drugs. The son testified he felt unsafe and was afraid of his father.); *Fountain v. Fountain*, 93-2176 (La. App. 1 Cir. 10/7/94), 644 So.2d 733, 738 (Court found supervised, restricted visitation was in child's best interest due to father's alcoholism, drug abuse and change of personality traits after a head injury, due to the fear and reluctance of the child to visit her father.); *Noe v. Noe*, 640 So.2d 537, 538-39 (La. App. 3rd Cir. 1994) (A father was allowed visitation of his ten-year-old daughter supervised by his wife after previously molesting his two older daughters and two other minors while he was abusing alcohol. The father was also ordered to refrain from the consumption of alcohol.); *State ex rel. V.B.*, 09-653 (La. App. 3 Cir. 11/4/09), 24 So.3d 281, 282 (The court found supervised visitation was appropriate for a mother when there was evidence that she was not a good candidate to maintain sobriety due to her history of crack cocaine use and current positive tests for prescription drugs.); *Teague v. Teague*, 44,005 (La. App. 2 Cir. 11/25/08), 999 So.2d 86, 92 (The appellate court granted mother's request for visitation rights which guaranteed her frequent and continuous contact with her children after it was found that she frequently smoked marijuana and her mental health issues were likely to adversely affect the children.); *State, Dep't of Soc. Servs., Office of Cmty. Servs. in Interest of A.D.*, 628 So.2d 1288, 1289 (La. App. 3 Cir. 1993) (The court affirmed the trial court's granting of monthly supervised visits in a safe and controlled environment with the children after finding that father had sexually abused his three children. The trial court did not feel that there was enough evidence to indicate that visitation would be substantially detrimental when balanced with the right of a parent to have contact with their children.); *Devillier v. Devillier*, 536 So.2d 553, 555 (La. App. 1 Cir 1988) (The court found that although mother was not suited to care for child on a daily basis, there was no evidence to justify denying her unsupervised visitation despite being found to be erratic, unstable, emotionally and physically inappropriate).

evidence to the court to support the applicability of the potential for the child to be abused (factor 1), or the love, affection, and other emotional ties between father and child (factor 2). He did not seek a psychological evaluation of the child, nor did he observe interactions between Father and K.E.M.

A trial court may be presumed to have considered the factors of La. C.C. art. 134 if the court's judgment adopted a custody evaluation report that addressed the factors. *Williams v. Griffith*, 14-690 (La. App. 5 Cir. 4/15/15), 170 So.3d 265, 268. In the case at bar, it is not clear to this Court that the trial court adequately considered and weighed the article 134 factors in making its decision to deny Father supervised visitation. The custody report did not sufficiently address the factors or provide an up-to-date assessment of the parties. Dr. Thompson did not conduct a recent evaluation of Father despite his continued work with his psychiatrist, therapist, and AA. His opinion was based on an evaluation of January 18, 2017 (18 months before the hearing), based on interviews with the child on October 12, 2016 (20 months before the hearing) and Father on November 5, 2014, March 16, 2015, and May 10, 2016 (almost 2 years before the hearing). The trial court refused to consider evidence from Dr. Thompson's interview of K.E.M. on June 12, 2019, as it was not authorized by the court. Dr. Thompson also failed to testify to the psychological benefits of having a father involved in a child's life, despite pointing out in his evaluation of Mother and Father that they were both abandoned by their fathers and "for children, abandonment is a profound experience, which expectedly will negatively impact not only a child's developmental process, but also their ability to engage and sustain healthy relationships the rest of their lives."

The only evidence that visitation was not in the child's best interest was Dr. Thompson's testimony that it was not the preference of the child when he spoke to her in 2016 and his assessment of the moral fitness, mental health, and substance

abuse history of Father. Dr. Thompson informed the court that the "use of drugs compromises an individual's ability to make responsible decisions . . . assumes that they're compromised in their capability of making parental decisions." He testified that "if the parent follows whatever is outlined by the Court for remediation, I think it sets a foundation for the Court to revisit the question of contact with the child." This is an incorrect characterization of the statutes and case law relating to a parent's right to visitation as it relates to parents with addiction problems. *See* Footnote 29, *supra*.

Dr. Thompson relied primarily on K.E.M.'s age in his recommendation to the court. He testified that in his experience, the "limitations" of reunification for adolescents is that "parents, at this stage, don't visit with children." He opined that due to K.E.M.'s development stage, reunification would not be successful because the parent's role is to "supervise, transport, and watch at a distance." While Dr. Thompson recommended leaving the decision for the child to make due to her age, this Court sees no support in this record for the notion that the strains of adolescence justify abandonment of a parent-child relationship. Although Dr. Thompson expressed hesitancy that Father's progress would be "sufficient to be able to carry this forward in a way that will provide success in the relationship," the standard in granting visitation is not success; rather, it is providing a parent an opportunity to exercise parental rights in a way that benefits the child.

In this case, we find that the evidence presented by Mother was insufficient to bear her burden of proving that supervised visitation with Father would not be in K.E.M.'s best interest. The testimony of both Dr. Thompson and Ms. Ruel reflected that therapeutic intervention could assist Father and K.E.M.'s reunification. Father presented evidence of significant effort and improvements in his mental health since the consent judgment restricting his visitation.

Furthermore, Dr. Thompson testified, "K.E.M. needs to have a relationship with her father. What is more difficult now is figuring out how to pull that off."

*Evidence Required to Deny Visitation*

Visitation is "important for a child's whole growth, mental, physical and spiritual" and denial of visitation can make a child feel rejected and confused. *Maxwell*, 434 So.2d at 379 (*citing Pierce v. Yerkovich*, 80 Misc.2d 613, 363 N.Y.S.2d 403, 410 (Fam.Ct.1974)). Even to restrict visitation, this Court has required substantial evidence from a range of witnesses. We vacated a trial court's finding based on the child's opposition to visitation due to his religious beliefs, which were related to the judge in an interview, to be an insufficient basis to restrict visitation when the record failed to establish that visitation would not be in the child's best interest. *Becnel v. Becnel*, 98-593 (La. App. 5 Cir. 3/25/99), 732 So.2d 589, 595.[30] In affirming a trial court's granting of supervised visitation to a father accused of sexual abuse of his two children, this Court relied upon the testimony given by an independent evaluator psychologist, an addiction counselor, the mother's therapist, a social worker referred by the evaluator, the son's psychiatrist, the son's social worker, the children's psychologist, and the father's psychiatrist. *Rester v. Manuel*, 619 So.2d 655, 658 (La. App. 5 Cir. 1993), *writ denied*, 625 So.2d 172 (La. 1993).

Before affirming the denial of visitation to a mother, the Louisiana Supreme Court has required significant evidence by experts who had spent considerable time with the parties. *C.M.J. v. L.M.C.*, 14-1119 (La. 10/15/14), 156 So.3d 16, 22. In that case, the trial court found clear and convincing evidence that the mother abused her children by manipulating the children to make false allegations of physical and sexual abuse against their father over a long period of time in an

---

[30] This Court found in reviewing the record that "the animosity of the child's mother toward his father probably has influenced the child's attitude far more than his religious convictions." *Id*. at 593.

effort to align the children with her and alienate them from their father.[31]  The trial court received recommendations from a clinical psychologist, Dr. Pellegrin, who had conducted nearly 500 custody evaluations in her fifteen years of practice.  She had conducted an extensive mental health evaluation of the parties, seeing the parties on at least twelve occasions over a six-month period.  The trial court also heard from Louis Eaton, a licensed professional counselor and family therapist, who saw both parents for several sessions of family counseling, and was found to be objective, unbiased and highly experienced in the matters to which he testified.

In this case, the presumption in favor of visitation was not overcome by conclusive evidence that Father's exercise of that right would "injuriously affect the child's welfare." *Maxwell*, 434 So.2d at 379.  The trial court did not specify what harm could come to a fifteen-year-old from visitation facilitated by a mental health professional.  The trial court has inherent power to tailor visitation in a manner that minimizes risk of harm to the child.  *Evans v. Terrell*, 27,615 (La. App. 2 Cir. 12/6/95), 665 So.2d 648, 652, *writ denied*, 96-0387 (La. 5/3/96), 672 So.2d 695.  The mental health professionals supervising the visitation would be responsible for halting the visitation if they find it harmful.  They can regularly report their findings to the court, or a parenting coordinator.  Any risks to K.E.M. posed by reintroduction of her father in her life, detailed in the testimony of Dr. Thompson and Ms. Ruel, will still exist in two years when she turns eighteen.  At that point, Father and K.E.M. will be allowed to legally reunite on their own,

---

[31] The trial court ordered no visitation "due to grave concerns the Court has about [the mother]'s deteriorating mental health, her failure to seek therapy as recommended by the evaluator and the distinct possibility that she is untreatable even if she enters therapy, her continued position that the [sic] [the father] is a sexual and physical abuser, and the possibility that unmonitored contact with their mother will further damage the already fragile children." C.M.J., 156 So.3d at 27.  The La. Supreme Court allowed the possibility of monitored electronic communication "in the event the mother enters treatment and cooperates and takes all recommendations of appropriately qualified mental health professionals, who are to be recommended by Dr. Pellegrin and appointed by the Court, and are to be provided with this opinion and have access to the entire record of this matter, in order to obtain a thorough history of this case." Furthermore, after a period of three months in which the mother enters into treatment, and the children engage in therapy, the Court would consider closely monitored supervised visitation of the mother with the children after an updated evaluation by Dr. Pellegrin.

without therapeutic assistance.  The trial court erred in denying supervised visitation as there was insufficient evidence that supervised visitation would endanger seriously the child's physical, mental, moral, or emotional health. *Maxwell v. Leblanc*, 434 So.2d at 379.  The evidence before the trial court, taken with the general recognition of the importance of a child's continued contact with a noncustodial parent, proved that supervised visitation in this case is in the best interest of the child.  *Id*.  In this Court's opinion, it is in K.E.M.'s best interest to reunify her with her father under the guidance of counselors.  We conclude that the trial court was clearly wrong to find otherwise and therefore we reverse the decision of the trial court, and remand for implementation of a supervised visitation schedule.

*Disqualifications of Dr. Thompson*

While reversal renders moot the other errors raised by Father, this Court recognizes the need to analyze the role played by Dr. Thompson in this long, contentious custody case.  Custody evaluators, therapists[32], mediators[33], and parenting coordinators have separate and distinct roles in the child custody arena. A custody evaluator is appointed, pursuant to La. R.S. 9:331, to compile impartial, objective information, observations, reports, and opinions regarding the children and parties to assist the court in making a well-informed decision on custody arrangements.  The Louisiana Licensed Processional Board of Examiners publishes guidelines to assist Licensed Professional Counselors (LPC) in conducting child custody evaluations.  A parenting coordinator may be appointed for child-focused

---

[32] The court may also order an evaluation of the parties or child by a mental health professional who shall serve as a witness of the court. La. R.S. 9:331.  Independent therapists treating the party or child may also testify as to their observations or submit their treatment reports to the custody evaluator.
[33] An impartial mediator may be ordered by the court to assist the parties in resolving their controversies in custody or visitation proceedings, but the conduct or statements made in mediation are not admissible in any proceeding. La. R.S. 9:332 and 9:333.

alternate dispute resolution to assist with the implementation of a parenting plan.[34] La. R.S. 9:358.1.  It is the job of the parenting coordinator, who will not be called as a witness, to educate parents about the needs of the children, and to assist the parents in decisions regarding substance abuse testing and mental health assessment, as well as making referrals for needed services.  La. R.S. 9:358.4. and 9:358.5.

A review of the record shows that Dr. Thompson exceeded his role of evaluator by acting as a parenting coordinator by attempting to treat and educate the parties.  LPC Guidelines warn against "engag[ing] in multiple roles that might result in impaired impartiality, competence or effectiveness."  Louisiana Licensed Professional Board of Examiners, Guidelines for Establishing the Evaluator Role, Sec. III. *available at* https://www.lpcboard.org/assets/docs/Resources/LPC-Board-Guidelines-for-Child-Custody-Evaluation-9-8-10.pdf (last visited Jan. 15, 2020). In opining that Father fails to "display the level of shame that one would expect from an individual who exhibited such behavior in a civilized society," Dr. Thompson recounts his attempts to counsel Father:

> I did not believe [his acceptance of responsibility] had reached the level where he understood the magnitude of what could have happened given his failure as a parent in taking his children to a strip club and giving them to a sex worker.  I wanted to sensitize him to the risk that he was running of losing his children. . .  I wanted Mr. Main to understand the gravity of what he had done so that his behavior would change and responsibly be able to engage his two sons, because I saw his sons at risk.  That, eventually, came to fruition.  One of them died.  I was trying to prevent that.  Trying to prevent Mr. Main from committing suicide for the level of shame, and the potential was for him to commit suicide if he felt the level of shame that was there.

As Dr. Thompson's responsibility to the court was to evaluate the parties to assist the court in making a determination of visitation, it was not his role to provide

---

[34] A review of the record shows that Tim Kemery was acting as a parenting coordinator in 2013; however, a motion to appoint a parenting coordinator was filed on May 30, 2014.  It is not clear from the record if the motion was granted.

treatment to the parties and attempt to "change" a parent's behavior.[35] Evaluators are warned to "take great caution not to provide therapeutic interventions or to offer advice to participants." LPC Guidelines, *supra*, Sec. III.

Furthermore, Dr. Thompson's testimony and report demonstrate that his objectivity, necessary to the role of evaluator, has been compromised. In his report, he states:

> While David Main's abuse of prescription drugs in and of itself is sufficient cause to question allowing David Main to have any voice in the life of the one child who remains a minor, the behavior of David Main with his second son [S.M.], takes the behavior failure of David Main to a whole new level beyond what is typically found in even the most dysfunctional families.

He opined that if Father appreciated the consequences of his behavior, "the current action before the court would never have been filed, as David Main would have understood that based on his behavior he was *not entitled to any contact* with any of his children. . . The fact that David Main's punishment for his actions has been the very limited access to his daughter. . . should be celebrated by David Main."

In a troubling statement, Dr. Thompson opines that "[i]n some parts of the world the punishment for David Main's behavior could have been even worse under some legal systems where the behavior of David Main would qualify for the death penalty by stoning or beheading." Dr. Thompson's strong language condemning Father's behavior is in conflict with the LPC Guidelines that "[e]valuators should attempt to be as accurate and as nonpartisan as possible, and resist pressure to communicate their opinions in a manner that might be misleading." LPC Guidelines, *supra,* Part Four. Furthermore, Dr. Thompson's language in referring to Father's behavior with S.M. may reflect a lack of specialized training in the areas of child sexual abuse necessary to conduct the

---

[35] Child custody evaluators shall not offer advice or therapeutic interventions to anyone involved in the child custody evaluation process. Association for Family and Conciliation Courts' Model Standards of Practice for Child Custody Evaluation 8.4, May 2006, *available at* https://www.afccnet.org/Portals/0/ModelStdsChildCustodyEvalSept2006.pdf.

assessment.  *See* Association for Family and Conciliation Courts' Model Standards of Practice for Child Custody Evaluation 5.11, May 2006, *available at* https://www.afccnet.org/Portals/0/ModelStdsChildCustodyEvalSept2006.pdf.

Dr. Thompson's custody evaluation report was also not provided to the court in a timely manner, despite his testimony that he formed his opinion "roughly five years ago."  His testimony was based on a report and evaluations which had not been updated in almost two years.  Dr. Thompson did not observe Father and K.E.M. together, despite the LPC Guidelines stating that "all children should be observed in the presence of their parents, unless verifiable threats to children's physical or psychological safety will create foreseeable risk of significant harm to the child or where conducting an observation is impossible."[36]  His report mentions only that "this clinician did not see [K.E.M.] and [Father] together in the office."

Dr. Thompson was unaware if *ex parte* communications with attorneys was part of his guidelines for conducting child custody evaluations.  He testified to several *ex parte* communications with both party's attorneys during the case.  While he felt that he had an agreement with the attorneys that *ex parte* communications were acceptable, Father changed counsel during the pendency of this case.  Dr. Thompson interviewed K.E.M. and Mother on June 12, 2019 at the request of Mother's attorney without notifying Father.  He also invited a third party attorney, who had no relationship to this case, to witness, participate in, and render advice in a session between the parties.

Our review of Dr. Thompson's report and testimony reveals that he has become unable to provide the court with impartial and objective information and opinions within the Louisiana Licensed Professional Board of Examiners' guidelines for the proper conduct of custody evaluators.

---

[36] Evaluators should view "samples of the interactions between and among the children and parents, and may obtain observational data reflecting on parenting skills and on each parent's ability to respond to the child's needs."  Model Standards of Practice for Child Custody Evaluation 10.2, *supra*.

*Mother's Request for Sanctions*

As we find merit to Father's appeal, we decline to award Mother sanctions, costs, and attorney's fees. Appeals are favored and appellate courts are reluctant to impose a penal award of damages for frivolous appeals, which should be imposed only when it appears that the appeal was taken solely for delay or where appellant's counsel seriously does not believe he has a legal position. *Fouchi v. Fouchi*, 442 So.2d 506 (La. App. 5 Cir. 1983), *writ denied*, 445 So.2d 1235 (La. 1984). Where contentions on appeal are without merit but raise legitimate issues, damages for frivolous appeals are not allowed. *Sample v. Sample*, 432 So.2d 376 (La. App. 1 Cir. 1983). Here, Father raised legitimate issues which preclude an award of attorney's fees for a frivolous appeal.

Further, we deny Mother's request to appeal the trial court's denial of sanctions. The record is clear that Mother's legal costs are due to her plethora of procedural motions to prevent the trial court from hearing the merits of Father's motions for visitation.

## CONCLUSION

We reverse the judgment of the trial court denying Appellant, David Main, supervised visitation with his minor child, K.E.M, and order therapeutically supervised visitation between David Main and K.E.M., in accordance with the recommendations of the hearing officer on March 15, 2018, through Caravelle Care or a similar mental health provider, as well as reunification therapy for David Main and K.E.M. Further, we order both parties to attend and complete a program designed to educate and inform the parties of the needs of their children pursuant to La. R.S. 9:331.2, and appoint a parenting coordinator pursuant to La. R.S. 9:358.1 to assist in the implementation of a parenting plan. Further, having found both the proceedings before the trial court and this Court to have merit, we deny Appellee, Dena Bach Main Waters' motion for sanctions and damages. This case

is remanded to the trial court to implement reunification therapy, therapeutic supervised visitation, parenting education, and the appointment of a parenting coordinator.

**REVERSED AND REMANDED.**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

MARY E. LEGNON
CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



**FIFTH CIRCUIT**

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**FEBRUARY 19, 2020** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES
NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 19-CA-503

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE DONALD A. ROWAN, JR. (DISTRICT JUDGE)
BERNARD A. DUPUY (APPELLANT)          BENNETT WOLFF (APPELLANT)          SCOTT C. STANSBURY (APPELLANT)
LESLIE A. BONIN (APPELLEE)

**MAILED**
DAVID I. COURCELLE (ATTORNEY)
3500 NORTH CAUSEWAY BOULEVARD
EXECTUTIVE TOWER, SUITE 185
METAIRIE, LA 70002